EDWARD BEMENT, survivor, &c. trustee, &c. *vs.* THE PLATTSBURGH AND MONTREAL RAILROAD COMPANY, SAMUEL F. VILAS and others.

The engines and cars of a railroad are not so affixed to the road that they can be called fixtures thereof, without introducing a new principle into the law of fixtures.

The rolling stock (engines and cars) of a railroad is personal property, which can be levied on and sold, as such, under an execution against the company, and will not pass by a deed or mortgage of the railroad track or way, by metes and bounds, as parts or fixtures thereof, or as constructively annexed thereto.

Such rolling stock will not pass by a mortgage of the railroad track or way, and a foreclosure and sale, unless the terms of the mortgage are such as to include or carry such rolling stock as personal property.

A mortgage of a railroad and the rolling stock on it, is not, so far as it relates to the rolling stock, within the purview or intent of the act of 1833, (*Laws of* 1833, *ch.* 279,) requiring chattel mortgages to be filed in the town or city where the mortgagor, if a resident of this state resides, and if not a resident, then in the town or city where the mortgaged property is, at the time of the execution of the mortgage.

Consequently, such a mortgage, though not filed as a chattel mortgage, in pursuance of the act of 1833, and there has been no change of possession, will not be void as to judgment creditors of the mortgagor, or those claiming the rolling stock under them, on the ground, or for the sole reason, that the mortgage was not so filed.

Bement *v.* Plattsburgh and Montreal Railroad Company.

THIS action was brought to foreclose two certain mortgages, held by the same trustees, (of whom the plaintiff is the survivor,) on the railroad and *equipments* of the Plattsburgh and Montreal Railroad Company.

The defendant Vilas alleged in his answer, in substance, that the mortgages had never been filed, as chattel mortgages, and that the *rolling stock* had, intermediate the giving of the mortgages and the commencement of this action, been sold on execution, and bought in by him. Thereupon the decree (which appears to have been made by consent) directed a sale of the mortgaged lands, railroad, buildings, docks, &c. but ordered the referee, before selling the *rolling stock* in question, to inquire whether it, or any part of it, was "subject to the lien of the said two mortgages, or either, and which of the same." The referee was also ordered to report separately, from time to time, as to any particular subject referred to him, and he, or either party had leave to apply at any time for further instructions.

The referee now reports in respect to the matters so at issue, between the plaintiff and Vilas : 1st. That the mortgages never were filed as chattel mortgages, but simply recorded as mortgages upon real estate. 2d. That the rolling stock was sold on execution, and bought in at such sale by Vilas, as alleged in his answer. 3d. That Vilas was, at the time, and long before and since, and indeed ever since the organization of the railroad company, a director of the same. 4th. That the whole stock had cost him, including some taxes and other expenditures on account of it, $10,658.88. 5th. That he had received for the sale of some, and the rent of other portions of it, $16,317.74. 6th. Leaving him with a surplus of money on hand, over and above all his expenditures, of $5,658.86, besides that part of the property still undisposed of. 7th. That after the purchase by Vilas, the railroad company, and afterwards Edward V. Price, their lessee, and still later the receiver appointed in this action, hired the rolling stock in question, from Vilas, and paid him

rent therefor. And thereupon the referee finds as conclusions of law : 8th. *That the mortgages not having been filed as chattel mortgages, were void as to judgment creditors.* 9th. That the railroad company had an equitable right to redeem from Vilas, the property purchased by him, by reason of his being a *trustee* at the time of such purchase, though such right was afterwards materially modified by hiring the property from him. 10th. That such right could be claimed and exercised by the plaintiff as mortgagee of the property in question. But, 11th. That such property ceased, upon its purchase by Vilas, to be "subject to the lien" of the plaintiff's mortgages ; and 12th. That the plaintiff has no lien thereon.

Both parties excepted to the report of the referee. The plaintiff to the conclusion of law, (8th,) that the mortgages were void as against creditors, for want of filing, and to the final conclusions of law, 11th and 12th. The defendant Vilas excepted to the findings as to the cost of the property to him, and the surplus in his hands ; and to the conclusion of law, that the railroad company had a right to redeem from him because he was a trustee, and to the finding of the referee, that he was a *trustee.* It does appear that the rolling stock, when sold to Vilas, was standing on the track ; it does not appear that it had ever been actually off the track.

*H. P. Fessenden,* for the plaintiff.

*Geo. M. Beckwith & Sons,* for the defendant Vilas.

SUTHERLAND, J. The conclusions I have come to, on the questions raised by the plaintiff's exceptions to the report of the referee, make an examination of the defendant Vilas' exceptions unnecessary.

The question presented by the plaintiff's exceptions is, were the mortgages void as to the defendant Vilas, because they were not filed as mortgages of goods and chattels, under

the act of 1833, (*Laws of* 1833, *ch.* 279, §§ 1, 2,) and there was no change of possession?

If the rolling stock of a railroad is personal property, and if the mortgages, *as to the rolling stock,* were within the act of 1833, then the mortgages were void as to the defendant Vilas, neither mortgage having been filed as a chattel mortgage, according to the act, and there having been no change of possession.

*First.* Is the rolling stock (engines and cars) of a railroad personal property, so that it can be levied on and sold as such under an execution against the company, or so that it would not pass by a deed or mortgage of the railroad track or way by metes and bounds, as parts or fixtures thereof, or as constructively annexed thereto?

In my opinion, the engines and cars of a railroad are not so affixed to the road that they can be called fixtures thereof, without introducing a new principle into the law of fixtures. They can not properly be said to be *fixed* to the track; they can be lifted off the track and put on it again, by simply overcoming the law of gravity, and without any injury to the track, or rails. They are not stationary, and are not intended to be. Their use is in being moved rapidly from one end of the road to the other, and frequently on and over a succession of roads. We can take judicial notice of what every body knows, that sometimes they *run* and *jump* off the track. We can take judicial notice of the fact, that there are many railroads, some of them connecting with each other; and that the cars and engines of one road pass on to and over another; for there is a statute regulating such connections, and declaring the liability of one company as carriers of freight on the connecting road of another company. Certainly, cars and engines are essential for operating a railroad; but so are farming tools and implements for working a farm. The railroad company probably intends that its rolling stock, and the farmer, that his farming implements, shall be used on the railroad and farm, until used up; but this *intended* per-

manent local use of the farmer does not make his ploughs, and reaping and mowing machines, *fixtures.*

If railroad corporations have power to borrow money and to incur debts, their property must be liable to be sold under execution, and it would not be a favor to these corporations to hold that their rolling stock can not be levied on and sold as personal property.

If there was but one railroad in the country, there would be some reason in holding that its rolling stock was *constructively* annexed to the road, and should go with it, for then such rolling stock, separated from the road, would hardly have a marketable value; but we know that railroads are about as common now as turnpikes were formerly; that they are nearly all of the same gauge; and that railroad cars and engines are bought and sold and transferred, from one railroad to another, like wagons or post coaches; and I do not see why cars and engines on a railroad, are any more fixtures than post coaches on a turnpike road.

Certain things, such as doves in a dove-cote, rabbits in a warren, fish in a pond, deer in a park, house keys and blinds, and farm fences and hop-poles, even, when no way fixed to the land, have been held to be constructively annexed to the land, and to go with it. Some of these things — doves in a dove-cote, rabbits in a warren, fish in a fish pond, deer in a park — from their nature and condition could not very well be treated and disposed of as personal property. How could the sheriff levy on, or make an inventory of, doves in a dove-cote, rabbits in a warren, deer in a park, or fish in a pond ? But I suppose that either doves, deer, fish or rabbits, caught and kept, so that they could be counted and delivered, would be considered goods and chattels, like domestic poultry.

As to title deeds, keys and blinds, it is reasonable they should go with the land, for they are worth much more going with the land than to sell and separate from it, as chattels. What would title deeds be worth to any one but the owner of the land ? Who would buy keys and window blinds,

upon the theory that they might fit other locks and houses? As to farm fences and hop-poles, when in no way fixed to the land, it may not only be said that they are intended to be permantly used on the farm, or a certain tract or parcel of land, but it may also be said of them that usually they are worth much more going with the land than to sell and separate from it, as chattels.

Call the rolling stock of a railroad fixtures, and questions of difficulty may be suggested.

If a railroad corporation mortgages five miles of its road or road-bed, by metes and bounds, will any of the cars or engines pass by a foreclosure and sale under the mortgage? If any, how many? and which? If the corporation mortgages one half of its road or road-bed to-day to A. B. by metes and bounds, and to morrow the other half to C. D. by metes and bounds, what will be the rights or liens of the respective mortgagees, to, or upon, the rolling stock? Will any part of it be carried by a foreclosure and sale under either mortgage?

The real estate of corporations liable to taxation is to be assessed in the town or ward in which it lies, in the same manner as the real estate of individuals. (1 *R. S.* 908, § 6, *5th ed.*) If the cars and engines of the Hudson River Railroad are fixtures, and a part of its real estate, where are they to be assessed?

This question, whether the rolling stock of a railroad is personal property, or should be regarded as fixtures, has been discussed in three cases in this state: *The Farmers' Loan and Trust Co.* v. *Hendrickson*, (25 *Barb.* 484;) *Stevens* v. *The Buffalo and N. Y. R. R. Co.* (31 *id.* 590;) and *Beardsley* v. *The Ontario Bank*, (*Id.* 619.)

In the first of these cases, it was held, that as between mortgagees and judgment creditors, the rolling stock was to be deemed fixtures, and as such, would pass under a mortgage of the *track or roadway.* In the other two cases it was held that the rolling stock was personal property, and

that it would not pass under a mortgage, as fixtures, or real estate.

The foregoing considerations, and the opinions in the two last cases, have led me to the conclusion that the rolling stock in question was, and is, and must be deemed, personal property ; and that such rolling stock would not, and could not, pass by foreclosure and sale under the mortgages, or either of them, in this case, *if the terms of the mortgages had not been such as to include or carry such rolling stock as personal property.*

The cases of *Coe, trustee,* v. *Pennock and others,* (6 *Am. Law Reg.* 27 ; *S. C.* 23 *How. U. S. R.* 117;) *Ludlow* v. *Hurd, in the superior court of Cincinnati,* (*Id.* 493;) *Phillips* v. *Winston,* (18 *B. Munro,* 431,) and other cases, holding that a railroad mortgage, which in terms is sufficiently broad to embrace subsequently acquired rolling stock, may be in equity a lien thereon, do not at all interfere with this conclusion.    Indeed, it may be said that these cases assumed the subsequently acquired rolling stock to be personal property ; otherwise the question of lien would not have arisen. No one can doubt that chattels, *affixed* to the lands mortgaged, by their *affixture* pass under the lien of the mortgage.

*Secondly.* But the question remains, assuming that the mortgages in this case were intended to cover, and did cover, the rolling stock in question, (and this appears to be assumed by the counsel,) whether they are void as to the defendant Vilas, because they were not filed as chattel mortgages under the act of 1833, (*Laws of* 1833, *ch.* 279, *p.* 402, &c.) and there was no change of possession.

Considering that the counsel and the court, in *The Farmers' Loan and Trust Co.* v. *Hendrickson,* (25 *Barb.* 484,) and in *Stevens* v. *Buffalo and New York City R. R. Co.* (*supra,*) appear to have *assumed* that the mortgages in those cases were, as to the rolling stock, within the act of 1833, and void as to the judgment creditors, because they had not been filed as chattel mortgages, according to the pro-

visions of the act of 1833, it has been with hesitation, and only after a most careful consideration of the question, that I have come to the conclusion that the mortgages in this case, assuming that the rolling stock in question was covered by them, were not, as to it, within the act of 1833, and were valid as to the defendant Vilas, irrespective of the question whether, as a director, he was a trustee or not, though they were not filed as chattel mortgages, under the act of 1833, and though there was no change of possession. I can not think that the act was intended to apply to a mortgage of a railroad and rolling stock on it.

In the first place, I doubt whether a railroad corporation, domestic or foreign, is a resident or non-resident, within section 2 of the act. No doubt, corporations are generally to be deemed a "person" or "persons," within the meaning of those words when used in a statute; unless otherwise expressly provided, or there is something in the subject or context repugnant to such construction; but this act of 1833 is a special statute, full of details, and some of its details as to the filing of chattel mortgages, appear to be repugnant to the idea that a mortgage by a railroad corporation, of its road and rolling stock is, or was intended to be, within the act.

By the act, chattel mortgages are to be filed in the town or city where the mortgagor, if a resident of this state, resides; if not a resident, *then* in the town or city where the mortgaged property *is, at the time of the execution of the mortgage.*

Now a *foreign* corporation can own and operate a railroad in this state; and if the New York and Erie was owned and operated by a foreign corporation, and it should mortgage its road and rolling stock, where—in what town or towns, or city—should the mortgage be filed? If made when the road was in full operation, the inquiry as to the town or towns or city in which the rolling stock was, at the time of the execution of the mortgage, would be a curious one.

Section 3 of the act, providing for a renewal of the mortgage by filing a copy, &c. evidently contemplates a change of residence of the mortgagor, for the copy is to be filed where the mortgagor *then* resides. A change of *residence* is scarcely predicable of a railroad corporation.

In the second place, I doubt whether a mortgage of a road and rolling stock on it should, as to rolling stock, be deemed a mortgage of goods or chattels within the intention or purview of the act.

In 1833, when the act was passed, railroads were new things. Very few were in existence in the United States. The first railroad incorporation, (the Mohawk and Hudson,) in this state, was in 1826. The Utica and Schenectady was incorporated in 1833. A few unimportant roads were incorporated between 1826 and 1833. Railroads were justly looked upon as great public improvements, and, in theory at least, as constructed and operated for public use, under acts of incorporation granting powers materially interfering with private rights. The charters of the Mohawk and Hudson, and of the Utica and Schenectady, contained an express provision that the state, at the expiration of a certain period, could take the road, &c. on paying the cost of its construction and a certain rate of interest thereon. The general railroad act of 1848, (*Laws of* 1848, *ch.* 140, § 26,) contained a similar provision. Railroad corporations were not at first looked upon as machines for issuing bonds, and giving mortgages, and creating a sort of new currency. As they could not be operated without rolling stock, and as they were, in theory, constructed and operated for the public good, and as their franchises could not be abandoned or transferred without the consent of the legislature, it is not reasonable to suppose that the legislature which passed the act of 1833, relating to chattel mortgages, thought that railroad corporations would mortgage either road or rolling stock, none of the previous charters containing any express power to do so. Certainly it is not reasonable to suppose that the legislature

could have anticipated that such corporations would mortgage the rolling stock on their roads, *without the road-track or way;* and if the road-track or way, *and* rolling stock on it, of a railroad like the New York and Erie were mortgaged by the same instrument, is it reasonable to suppose that the legislature intended that the mortgage as to the rolling stock should not operate as a mortgage, as against creditors, unless the mortgage was filed in every town and city through which the road passed? It is not reasonable to suppose that the legislature could have anticipated that a railroad corporation could or would mortgage its rolling stock without its road, and accompany the mortgage by an *immediate delivery,* and thus necessarily discontinue or abandon the operation of the road.

Though the rolling stock on a railroad, viewed separately and as a distinct thing from the road-way or track, and especially with reference to its capability of being taken off and put on the track without injury to the track or rails, must, as we have seen, according to strict legal principles, be deemed chattels, yet when the act of 1833 was passed, and now, a railroad in operation, was, and is, commonly looked upon and spoken of as consisting of road *and* rolling stock, because used and operated in connection, though technically without any affixture, and because the one can not answer its purpose at all without the other. I think this consideration should have great weight on the question of the intent or scope of the act of 1833; for it is to be presumed that the legislature which passed the act of 1833, viewed railroads in the aspect in which they were and are commonly viewed, and not in the aspect resulting from the application to the rolling stock, of the technical law or doctrine of fixtures.

Aside from the question of the right or power of a railroad corporation, without express authority, to mortgage its franchises, or road, or rolling stock, if when the act of 1833 was passed it was not a supposable case that a railroad corporation would mortgage the rolling stock on its road *without*

*the road,* it does not look to me reasonable that railroad mortgages of road and rolling stock should be deemed, as to the rolling stock, within the purview of the act of 1833, *or within the mischiefs or frauds intended to be prevented or remedied by the act.*

The main purpose of the act of 1833 was to prevent persons obtaining credit as absolute owners of goods and chattels in their possession, which they had mortgaged. Now any one interested in knowing whether the rolling stock on a railroad was mortgaged, reasonably supposing that the rolling stock would not be mortgaged without the road, would naturally go for information to the proper offices for recording railroad mortgages as real estate mortgages. It appears to me that a construction or application of the act of 1833, which requires a mortgage of a railroad, with the rolling stock on it, to be filed in every town and city through which the road runs, is unreasonable, because it calls for a *useless* and troublesome ceremony, and the renewal of a *useless* and troublesome ceremony at the end of every year, until the mortgage is paid or discharged. (*See section* 3 *of the Act of* 1833.)

It is quite clear that a railroad corporation has no power to mortgage its *franchises*, without the consent of the legislature, and it is very questionable whether it has power to mortgage its road or rolling stock without such consent. (*See Winch* v. *Railway Co.,* 13 *Eng. L. and Eq.* 506 ; *S. Y. R. Co.* v. *Great N. R. Co.,* 19 *id.* 513 ; *Troy and Rutland R. R. Co.* v. *Kerr,* 17 *Barb.* 581 ; *State* v. *Rivers,* 5 *Iredell,* 297,) and cases before cited, as to lien of railroad mortgages on subsequently acquired rolling stock.

Now, in view of this doubtful question of power, and of the fact that not one of the acts incorporating railroad corporations in this state, prior to the act of 1833, relating to chattel mortgages, contained any express power to mortgage either their franchises, or any part of their property, and in view of the public purpose for which these franchises were

granted, and of the fact that a mortgage of the rolling stock of the road, with or without the road, might lead to a discontinuance of its operation, to the injury of the public, can it be supposed that the legislature intended, by the act of 1833, impliedly to recognize the power of railroad corporations to mortgage their rolling stock, either with or without their roads, by including such mortgages in the provisions of the act of 1833 ? I think not.

The express power, in the general railroad act of 1850, (§ 28, *subd.* 10,) is a power to mortgage *all* "their corporate property and franchises," for their bondholders.

In *Beardsly* v. *Ontario Bank,* (31 *Barb. supra,*) the question, whether the mortgage should have been filed as a chattel mortgage, did not arise, and was not decided. The question in that case was, whether the rolling stock was mortgaged by the terms "railroad, real estate, and chattels real ;" and it was held that the rolling stock was personal property and did not pass *by those words.*

In *The Farmers' Loan and Trust Co.* v. *Hendrickson,* (25 *Barb. supra,*) and in *Stevens* y. *Buffalo and New York City R. R. Co.,* (31 *id. supra,*) the rolling stock was, in terms, included in the mortgages, and the question whether the mortgages should have been filed as chattel mortgages, did arise ; and it was decided that the mortgage as to the rolling stock was void as to the judgment creditors, not having been so filed; but this appears to have been *taken for granted* both by counsel and court. The opinions are able and elaborate on the question whether the rolling stock should be deemed fixtures, or personal property, but the other question does not appear to have been discussed or examined at all.

Upon the whole, I am of the opinion that the mortgages under which the plaintiff claims the rolling stock in question, assuming that they are worded so as to cover it, should not be deemed, as to *it*, within the purview or intent of the act of 1833 ; and that they were not void as to the defendant

Vilas because they were not filed as chattel mortgages in pursuance of that act.

In the case of *The People* v. *Utica Ins. Co.*, (15 *John.* 381,) it is said: "A thing which is within the intention of the makers of a statute, is as much within the statute as if it were within the letter; *and a thing which is within the letter of the statute, is not within the statute unless it be within the intention of the makers.*"

It is evident that the decision of the Court of Appeals in *Murdock* v. *Gifford*, (18 *N. Y. Rep.* 28,) does not interfere with my conclusion on this second question; for the question is simply a question as to the construction and scope of the act of 1833.

The exceptions of the plaintiff to the conclusions of law of the referee are sustained, and held to have been well taken, with $10 costs to the plaintiff, to abide the final decree in the action.

The question as to what further order or direction should be given, is reserved until the settlement of the order in this matter, which must be settled on sufficient notice.

[NEW YORK SPECIAL TERM, November 5, 1866. *Sutherland*, Justice.]