Williamson v. N. J. Southern R. R. Co.

Benjamin Williamson, trustee, appellant,

and

The New Jersey Southern Railroad Company and others, respondents.

29 311
47 575

29 311
50 124

29 311
55L 63

29 311
53 359
53 367
57L 306

29 311
55 602
55 673
60L 443

29 311
56 676

29 311
67L 209
67L 210
67L 497

29 311
65 554

1. A mortgage of after-acquired property attaches to the property in the condition in which it comes into the hands of the mortgagor, subject to such liens and encumbrances as are then on it; and when the legal title is in another, and the property is made subject to such a mortgage by a decree in chancery, by reason of equities of the mortgagor in the premises, the mortgagee takes subject to the rights of third persons, acquired before the property was subjected by such a decree to the lien of the mortgage.

2. A vendor of goods and chattels who is induced by fraudulent means to part with his property under color of a contract of purchase, may disaffirm the sale and reclaim the property. In such case no title passes to the fraudulent vendee, even though delivery be made; nor will execution creditors, or purchasers, or mortgagees from the fraudulent vendee, acquire a title superior to that of the original vendor, unless they be purchasers or mortgagees bona fide and for a valuable consideration.

3. A vendor who is induced to part with his property by fraud may rescind the contract of sale and reclaim the property, until, with a knowledge of the fraud, he elects to ratify and confirm the sale, or third persons acting on the apparent ownership of the property by the fraudulent vendee, acquire rights therein bona fide and for a valuable consideration.

4. Delay in exercising the right of rescission is evidence of an election to treat the sale as valid, of more or less weight, according to the circumstances of the case, but of itself does not operate as an estoppel, unless in the meantime third persons have acquired rights in the property bona fide and for a valuable consideration.

5. The doctrine of courts of equity that a mortgage of personal property afterwards to be acquired by the mortgagor, attaches to the property as soon as it is acquired by the mortgagor, is founded on the maxim that equity considers that to be done which ought to be done, and applies only where the contract of the mortgagor to transfer such after-acquired property to the mortgagee, is such as under the circumstances would be the subject of a decree for specific performance. Where the property is acquired by the mortgagor by a fraudulent purchase, a court of equity will not give effect to the fraud of the mort-

gagor, and deprive the vendor of his right to rescind the contract of sale and reclaim the property, where no superior equities have intervened.

6. In replevin, where the property has been redelivered to the defendant under the ninth section of the act concerning replevin, the plaintiff, if he succeeds in his action, may have the value of the property adjudged to him absolutely, as part of his damages, and the defendant cannot discharge himself from the payment of such damages by a return of the property. Where a court of equity enjoins the prosecution of an action of replevin, and undertakes to afford the plaintiff in such action relief in the equity proceedings, the measure of the relief should be the same as the redress obtainable in the action at law—*i. e.*, the value of the property and damages for its detention.

7. The engines, cars and rolling stock of a railroad must be regarded as chattels, which have not lost their distinctive character as personalty by being affixed to and made part of the realty.

8. A mortgage executed by a railroad corporation on its road-bed and franchises, together with its engines, cars and rolling stock, so far as regards the latter class of property, is a chattel mortgage within the provisions of the act concerning chattel mortgages (*Rev.* p. 709).

9. Under the provisions of the last-mentioned act, the fact that the mortgagee of chattels has taken possession of them under his mortgage before judgment recovered, will not give validity to a prior chattel mortgage, as against an execution creditor, where the mortgage has not been filed as required by the act, and was not accompanied by an immediate delivery and followed by an actual and continued change of possession of the property mortgaged. In this respect a distinction is made in the act between creditors of the mortgagor and subsequent purchasers or mortgagees.

10. An execution creditor having by a levy on goods and chattels covered by a prior chattel mortgage, acquired priority over such chattel mortgage by reason of the failure of the mortgagor to file his mortgage or take immediate possession of the property mortgaged, is not deprived of his priority by a subsequent act of the legislature making the filing unnecessary when the mortgage is registered as a conveyance of lands.

11. Words in a statute ought not to have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intention of the legislature can not otherwise be satisfied.

12. An execution creditor by the levy of his execution acquires a vested right in the property seized under his execution, which he

Williamson *v.* N. J. Southern R. R. Co.

cannot be deprived of by a subsequent act of the legislature. An act of the legislature which should attempt to displace the priority acquired by such levy, and substitute a junior encumbrance in its place, would be unconstitutional and void.

13. Actual annexation to the ˅ realty or something appurtenant thereto, is the condition upon which property ordinarily regarded as personal, becomes a fixture and part of the realty. The intention to make a chattel a part of the realty is only important upon the question whether the owner intended to make the chattel so affixed a temporary or a permanent accession to the freehold.

14. The doctrine of constructive annexation is only applicable to cases in which the chattel, by actual annexation, was once part of the realty, and has been temporarily detached from the freehold without intent to sever it therefrom. Having once been part of the realty, a removal temporarily, without intent to sever permanently, will not reconvert the chattel into personalty and destroy its character as a fixture.

On appeal from a decree of the chancellor. His opinion may be found in *Williamson v. N. J. Southern R. R. Co.,* 1 ~~28~~ *n.J.Eq.* Stew. 278.

*Messrs. Barker Gummere* and *A. Q. Keasbey,* for the complainant.

*Messrs. J. B. Vredenburgh* and *Cortlandt & R. Wayne Parker,* for Berthoud & Co.

*Messrs. John Linn* and *Mercer Beasley, Jr.,* for the Lehigh Car Manufacturing Company.

*Mr. Jacob Vanatta,* for the Lackawanna Iron and Coal Company.

DEPUE, J.

The Raritan and Delaware Bay Railroad Company was incorporated in 1854. Its corporate name was changed to The New Jersey Southern Railroad Company, in 1870. Under the powers granted in its charter, the company con-

structed a railroad from Port Monmouth, on the Raritan bay, to Atco, in the county of Camden, together with branch railroads from Eatontown to Long Branch, in the county of Monmouth; from Manchester to Toms River, in the county of Ocean; and from Atsion, in the county of Burlington, to Jackson, in the county of Camden.

On the 14th of September, 1869, the company made the complainant's mortgage, in trust, to secure bonds issued to the amount of $2,000,000. The property mortgaged comprised all the railways, branches, rights of way, depots, station-houses, and the company's franchises then held or thereafter to be acquired, including its rolling stock, fixtures, tools and machinery, and all real estate of every kind, wheresoever situate, and all personal property, of every nature, kind or description then held or thereafter to be acquired. It also contained a covenant that the company would hold all after-acquired franchises and property, real and personal, in trust, for the mortgagee, and would make conveyance thereof accordingly, from time to time, as the same might be acquired.

The bill originally filed was an ordinary foreclosure bill, to which the New Jersey Southern Railroad Company and the trustees named in the second and third mortgages were the only parties. After bill filed and interlocutory decree thereon, other interests and rights under the complainant's mortgage were discovered, and claims were preferred by other persons of rights in some of the property, for the enforcement of which suits at law had been brought, and an amendment of the complainant's proceedings was deemed advisable. Supplemental bills were therefore filed, on the 11th of May, 1874, and the 20th of September, 1876. By these supplemental bills and orders and decrees made, from time to time, on several branches of the case, and submissions thereto by the parties, the court of chancery assumed jurisdiction over the rights, legal and equitable, of all the parties in or relating to the property in controversy. The chancellor, on final hearing, so regarded the scope of

the litigation, and the propriety, if not necessity, of such a course, clearly appears from so much of the record as has been removed into this court.

From the final decree the complainant has appealed. Of the defendants, Berthoud & Co., the Lehigh Car Manufacturing Company, and the Lackawanna Iron and Coal Company have also appealed. No appeal was taken by the other defendants. The discussion in this court was confined to the rights of the parties appealing *inter sese*.

First: Berthoud & Co. claim a mechanics lien under the the tenth section of the mechanics lien act (*Rev.* p. 669), for work done and materials furnished by them in erecting certain docks, wharves and piers at the terminus of the Long Branch and Sea Shore Railroad, near Sandy Hook. This work was done under a contract, in writing, between the claimants and the New Jersey Southern Railroad Company, made on the 17th of May, 1873. It was completed on the 21st of November, 1873. The lien claim was filed on the 23d of July, 1874, against the New Jersey Southern Railroad Company, as builders, and the Long Branch and Sea Shore Railroad Company, as owners; and summons was issued thereon on the 16th of October, 1874. Berthoud & Co. were made parties to this suit by the first supplemental bill, and the prosecution of their action at law to enforce their lien was enjoined.

The validity of this claim is contested for imperfections and illegality in the filing of the lien claim, and in the prosecution of the suit thereon. All these objections were carefully considered by the chancellor, and discussed with a fullness that will not admit of argument beyond a restatement of the grounds on which he reaches the conclusion sustaining the lien. It is sufficient to say, that no reason has been made to appear whereon to reject his conclusions in that respect. Nor are we satisfied that any error has been committed, in law or in fact, in the designation of the curtilage to which the lien should attach.

The contest on this part of the case, of the greatest importance, is with regard to the priority of this lien over the complainant's mortgage. The complainant's mortgage was recorded in the county of Monmouth, on the 15th of September, 1869. The shore to which these docks, wharves and piers were annexed is in the same county. By the twenty-third section of the mechanics lien act, the lien is entitled to priority over mortgages and other encumbrances, except such as are created and recorded or registered prior to the commencement of the building (*Rev.* p. 673).

The Long Branch and Sea Shore Railroad Company was incorporated March 20th, 1863, and its road was constructed between Long Branch and Spermaceti Cove, on Sandy Hook, within three miles of its present terminus. The length of the road is about twenty miles, and the only point of contact with the road of the New Jersey Southern Railroad Company is at Long Branch. It was built as part of a competing line between Long Branch and New York city, and was operated as such until the year 1870. By supplements to the charters of the two companies, passed on the 16th of February, 1870 (*P. L.* 1870, pp. 228–230), a consolidation of the capital stock of the two companies was authorized with the consent of two-thirds of the stockholders of the said companies respectively; and in lieu thereof the New Jersey Southern Railroad Company was empowered to purchase the stock or the railroad of the Long Branch and Sea Shore Railroad Company.

No consolidation in fact of the two companies was ever effected; nor was the railroad of the Long Branch and Sea Shore Company acquired by the New Jersey Southern Company by any formal purchase or conveyance. The latter company became the owners of one thousand six hundred and nineteen shares of the one thousand seven hundred and eighteen shares of the capital stock of the former company, and in the summer of 1870 took possession of the railroad of the Long Branch and Sea Shore Company, and has operated it ever since, in connection with its main line,

and with its own rolling stock, and expended a large amount of money in permanent improvements, and in the extension of the road from Spermaceti Cove to the present terminus. In the meantime the legal title to the railroad has remained in the Long Branch and Sea Shore Company. The chancellor, laying hold of the fact that the New Jersey Southern Company was the owner of this stock, and had made a large expenditure of money in view of a consolidation of the two companies, by a decree made on the 20th of February, 1877, declared that the railroad and the property and franchises of the Sea Shore Company, in equity, belonged to the New Jersey Southern Company, and were subject to the lien of the complainant's mortgage. *Williamson* v. *The N. J. Southern R. R. Co.*, 1 *Stew.* 278. Until that decree was signed, the right of the complainant in the lands of the Sea Shore Company under his mortgage was a mere unexecuted equity, to have the benefit of such equities as his mortgagor had in the premises without any legal title in himself or in his mortgagor upon which his mortgage as a conveyance could operate.

Where a mortgage attaches to after-acquired property, and additions are made to the premises, after the title becomes vested in the mortgagor, by the erection of buildings, or the construction of embankments, or the laying of rails for a track, such additions become part of the mortgaged premises, as they are made on the maxim *quicquid plantatur solo, solo cedit*, and enure to the benefit of the mortgagee. But where the after-acquired property comes into the hands of the mortgagor, subject to encumbrances or liable to liens, the mortgage attaches to the property in the condition in which it comes to the mortgagor's possession, subject to such liens and encumbrances as are then on it. *Willink* v. *Morris Canal Co.*, 3 *Gr. Ch.* 377; *Dunham* v. *Railw. Co.*, 1 *Wall.* 254; *Galveston R. R. Co.* v. *Cowdrey*, 11 *Wall.* 459; *United States* v. *N. O. R. R. Co.*, 12 *Wall.* 362. When the decree of the chancellor was signed, which established the lien of the complainant's mortgage on the prop-

erty of the Long Branch and Sea Shore Company, Berthoud & Co. had, by force of the provisions of the mechanics lien act, acquired a lien on the premises which related back to the commencement of the building, and was entitled to priority over all conveyances, mortgages or encumbrances subsequent thereto. This lien was not displaced by the chancellor's decree, which, in the absence of fraud, could be effective only to bring under the complainant's mortgage the lands of the Sea Shore Company, subject to such liens as were lawfully acquired while the legal estate was in that company. The chancellor's decree, adjudging the validity and priority of the claim of Berthoud & Co., should be affirmed.

Second: The Lehigh Car Manufacturing Company, on the 7th of April, 1873, made a contract in writing with the New Jersey Southern Railroad Company to build and deliver to the company one hundred box cars, according to specifications furnished by the company, for the price of $805 each, payable on the delivery of each twenty-five cars, in the notes of the company, at four months, with the company's first mortgage bonds, at seventy per cent. of their par value as collateral. In pursuance of this contract, seventy-five of these cars were delivered to the company. The first lot of twenty-five cars was delivered on the 15th and 20th of July, and the notes of the company were given for the full price on the 18th of August. The second lot of fifty cars was delivered on the 14th, 18th and 22d of August, and notes were given on the 4th of September for part of the price—the sum of $13,200.72 being withheld on account of alleged defects in the wheels. When these notes were given, certain bonds were delivered as collateral which were not first mortgage bonds. They were called first mortgage consolidated bonds, and were received by the car company in the belief that they were first mortgage bonds, such as were prescribed in the contract. In fact, they were securities only in appearance and entirely worthless.

The sale, as was held by the chancellor, was clearly conditional, the condition being that the security provided for

in the contract should be given simultaneously with the delivery of the property.

But it is contended in behalf of the complainant, that the car company lost its property in the cars and its right to reclaim them by a waiver arising from the delivery of them to the company, and neglect to exercise the right of reclamation in due season.   The contract being an executory contract to build the cars according to specifications, one of its incidents was the right of the vendee to examine them for the purpose of ascertaining whether they conformed to the contract.   Delivery to the vendee for that purpose was not a consummation of the contract of sale.   The sale was not completed until after the inspection and examination, and the performance of the condition precedent, of the delivery by the vendee of the securities stipulated for.

The evidence clearly shows that the car company was induced to complete the sale by the grossest fraud.   A vendor, who is induced by fraudulent means to part with his property under color of a contract of purchase, may disaffirm the sale and reclaim the property.   In such case no title passes to the fraudulent vendee, even though delivery be made; nor will execution creditors or purchasers or mortgagees under such fraudulent vendee, acquire a title superior to the original vendor, unless they be purchasers or mortgagees *bona fide* and for a valuable consideration. *Stoutenburgh* v. *Konkle*, 2 *McCart.* 33; *Hicks* v. *Campbell*, 4 *C. E. Gr.* 183; *Ash* v. *Putnam*, 1 *Hill* 302; *Van Cleef* v. *Fleet*, 15 *Johns.* 147; *Mowrey* v. *Walsh*, 8 *Cow.* 238; *Hicks* v. *Cleveland*, 39 *Barb.* 573; *Paddon* v. *Taylor*, 44 *N. Y.* 371; *Devoe* v. *Brandt*, 53 *N. Y.* 462; *Barnard* v. *Campbell*, 55 *N. Y.* 456, 58 *N. Y.* 73; *Earl of Bristol* v. *Wilsmore*, 1 *B. & C.* 514; *Load* v. *Green*, 15 *M. & W.* 216; *Clough* v. *L. & N. W. R. R. Co.*, *L. R.* (7 *Exch.*) 26; *Morrison* v. *The Universal Marine Ins. Co.*, *L. R.* (8 *Exch.*) 197; *Wiggin* v. *Day*, 9 *Gray* 97.   The vendor may rescind the contract of sale and reclaim the property until, with a knowledge of the fraud, he elects to ratify and confirm the sale, or third persons,

acting on the apparent ownership of the property by the fraudulent vendee, acquire rights therein *bona fide* and for a valuable consideration. Delay in exercising the power of rescission is evidence of an election to treat the sale as valid, of more or less weight, according to the circumstances of the case, but of itself does not operate as an estoppel, unless, in the meantime, superior rights of third persons have intervened. The chancellor has reviewed the evidence on that subject, and his conclusions in that respect are fully supported by the testimony.

The complainant does not occupy a vantage ground either at law or in equity over the original vendor. He was put in possession of the railroad, and these cars, as part of its equipment, in January, 1874, but no consideration was parted with under his mortgage on the faith of the apparent ownership of this property by the mortgagor. In equity, a mortgage of personal property afterwards to be acquired by the mortgagor, attaches to the property as soon as it is acquired by the mortgagor. *Smithhurst* v. *Edwards*, 1 *McCart.* 408; *Gevers* v. *Wright*, 3 *C. E. Gr.* 330, 333; *Pennock* v. *Coe*, 23 *How.* 117; *Beall* v. *White*, 94 *U. S. Rep.* 382; *Holroyd* v. *Marshall*, 10 *H. of L. Cas.* 191. But this doctrine is founded on the maxim that equity considers that to be done which ought to be done, and is applicable only where the contract of the mortgagor to transfer to the mortgagee the after-acquired property is such as, under the circumstances, would be the subject of a decree for specific performance. That this is the foundation and qualification of the rule as administered in courts of equity, will appear, on an examination of the cases above cited, and especially by the observations of Lord Westbury in *Holroyd* v. *Marshall*. In the present case, the contract of sale having been disaffirmed, the legal title to the cars in controversy is in the car company, and a court of equity will not aid to give effect to the fraud of the mortgagor in procuring the mortgaged property where no superior equities have intervened.

The decree of the chancellor, recognizing the rights of the car company as superior to those of the complainant, is consonant with principles of equity. But the relief granted is, in my judgment, too circumscribed. The decree merely directs that the complainant deliver up the said cars to the car company. The complainant obtained the possession of the cars when he was put in possession of the railroad, in January, 1874. He has ever since operated the road with the rolling stock, including these cars, practically under the supervision of the court of chancery. In February, 1876, the car company made a demand of the complainant of the return of the cars, and on the 5th of February, 1876, began an action of replevin in the supreme court of this state, against the complainant individually, for the recovery of the same. Under the writ issued in that suit the sheriff of Hudson county seized the said cars and held them in his possession until they were redelivered to the complainant, pursuant to the ninth section of the act concerning replevin (*Rev.* p. 972). The car company was made a party to this suit by the second supplemental bill, filed on the 20th of September, 1876, and the prosecution of the replevin suit was enjoined.

Under the proof in this case, the car company would have succeeded in its action of replevin, and the damages recoverable would have been the value of the property at the time of demand made, and damages for its detention thereafter (*Frazier* v. *Fredericks*, 4 *Zab.* 162), and the complainant, after judgment paid, would be entitled to be reimbursed the amount thereof out of the trust funds in his hands.

The decree does not do complete justice to the car company, nor does it give the complainant adequate indemnity. In substance it merely releases the hold of the court upon the property, and directs the complainant to redeliver it.

The car company having brought its action of replevin, and the cars having been redelivered to the defendant in that suit, it is not bound to accept a return of its property in satisfaction of its cause of action. In replevin, where the

21

property has been redelivered to the defendant, the plaintiff may have its value adjudged to him absolutely as part of his damages, and the defendant cannot discharge himself from the payment of such damages by a return of the property. *Field* v. *Post,* 9 *Vr.* 346. To leave the litigation open in the suit at law with a result that can be foreseen, is not advisable at this stage of this case. A court of equity always aims to make its determination complete, if it be possible. That may be done in this instance, within the scope which this litigation has been permitted to assume. Nor would it be the proper relief to remit the car company to the position of the holder of the bonds of the railroad company to the amount of the bonds deliverable under the original contract. The bonds which the car company should have received had then a market value which they probably do not now possess. Having taken proper steps to rescind the contract of sale on justifiable grounds, the legal result of the rescission was to revest the property in the company, with a right to maintain an action for its recovery in which the measure of redress was the value of the property at the time of the demand made on the complainant, and damages thereafter. The court of chancery having assumed jurisdiction of that controversy, should grant the same measure of relief as would have been obtained in the action at law. To that end the decree of the chancellor should be modified, and a decree made in favor of the car company for the value of the cars in the complainant's possession at the time of demand made on him, at what they were then worth, with interest on such valuation, to be ascertained by reference to a master.

Third : The Lackawanna Iron and Coal Company recovered a judgment against the New Jersey Southern Railroad Company, on the 19th of January, 1874, for damages and costs, amounting to $42,258.68. Executions were issued into all the counties of the state through which the company's railroad extended, and levies were made between the 20th and 24th of January upon the cars, engines and rolling

stock, and personal property of the railroad company. The Iron and Coal Company was made a party to this suit by the supplemental bill filed on the 11th of May, 1874.

The complainant's mortgage was duly recorded as a mortgage of real estate, soon after it was executed and delivered, and long before the judgment aforesaid was recovered, but was not filed in compliance with the act concerning chattel mortgages of March 24th, 1864, which makes every mortgage or conveyance intended to operate as a mortgage of goods and chattels, which shall not be accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged, absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers and mortgagees in good faith, unless the mortgage, or a copy thereof, be filed as is directed by the act (*Rev.* p. 709). The chancellor held that the rolling stock of a railroad company, mortgaged with the railroad, is part of the realty, and that if such rolling stock be personal property, the provisions of the above-mentioned act requiring immediate delivery and continued possession of the chattels mortgaged or filing instead thereof, were inapplicable to such mortgages. The appeal of the judgment creditor denies the soundness of this legal proposition in both its parts.

The complainant's mortgage, in terms, is comprehensive enough to cover property, real and personal, in present ownership and afterwards to be acquired, of every kind and description which is susceptible of sale or mortgage, either at law or in equity. But that does not solve the problem for consideration, which is, whether the rolling stock of a railroad company is such a constituent part of its realty as that it would pass under a conveyance or mortgage of its road-bed and franchises without other words of description. For fixtures which are part of the realty, like easements, will pass under a conveyance as part of the lands granted without additional words.

Where property personal in its character is subjected to mortgage, in connection with real estate, the effect of the mortgage on such personal property is presented in three aspects: First, whether the mortgage attaches to after-acquired property; second, whether the mortgagee is entitled in equity to restrain its sale under subsequent executions; and, third, whether such property has become a fixture so as to be part of the realty itself. A failure to discriminate between these different aspects in which the legal questions may arise, has caused considerable confusion in the cases.

The first two of these propositions may be regarded as judicially settled in the affirmative. It has been held quite generally that, in equity, a mortgage will apply to after-acquired personal property if apt words of description be contained therein, and that a court of equity will, at the instance of the mortgagee, enjoin the sale of such property under subsequent executions. But these principles have been applied, indiscriminately, to property indisputably personal, such as unattached machinery in a factory, goods in a store and furniture in a house, as well as to the rolling stock of a railroad. In *Smithhurst* v. *Edwards,* 1 *McCart.* 408, the property protected from sale under execution was the after-acquired furniture in a hotel. Decisions of this class give no support to the proposition under consideration.

To sustain the views adopted by the chancellor on this subject, counsel relied greatly on the decisions of the federal courts. An examination of those cases will show that the point has not been directly, or at least finally, adjudged.

The earliest, and perhaps the leading case, is *Coe* v. *Pennock,* decided by Judge McLean, as reported in 6 *Am. Law Reg.* 27, 2 *Redf. Am. Railw. Cas.* 546, and afterwards in the supreme court, and there reported *sub nom. Pennock* v. *Coe,* 23 *How.* 117. In that case the mortgage, which is set out in 23 *How.* 126, expressly enumerated, as part of the property mort-gaged, "all the present and future-acquired property, * * including engines, tenders, cars, tools, machinery, materials, contracts and all other personal property." The rolling

stock having been levied on under execution, a bill was filed by the mortgagees to restrain a sale. The only question for decision was, as expressed by Justice Nelson in the supreme court, "whether or not the after-acquired rolling stock of the company placed upon the road attaches, in equity, to the mortgage, *if within the description*, from the time it is placed there, so as to protect it against the judgment creditors of the railroad company." Nothing else was discussed in the supreme court, or decided in either court, but the validity of a mortgage of after-acquired property—a question in nowise depending on the distinction between the realty or personalty of the property mortgaged. The property mortgaged being inadequate to pay the mortgage debt, the injunction was allowed, as it was allowed in *Smithhurst* v. *Edwards* to restrain the sale of furniture, under similar circumstances. The observations of Justice McLean, so often quoted, with respect to the connection of the rolling stock with the railroad, and the injury that would result from the separation of the rolling stock from the road and its sale under execution, are properly referable to the question of the propriety of interference by injunction to stay the sale; just as Chancellor Green, in *Smithhurst* v. *Edwards*, adverts to the injury that would result to the rights of the mortgagor and mortgagee by a sale, under execution, of furniture mortgaged, as a reason for enjoining its sale under the execution.

In *Gee* v. *Tide Water Canal Co.*, 24 *How*. 257, the property levied on and offered for sale was land which was admitted to be necessary to the working of the canal. On bill filed by the company, the court enjoined the sale, on the ground that the property was necessary for the operations of the company's canal, and could not be dissevered from the franchises without destroying its useful existence.

In *Minnesota Co.* v. *St. Paul Co.*, 2 *Wall*. 609, a railroad company had divided its line of railway into two divisions, and had given separate mortgages on each division. The mortgages each enumerated rolling stock as part of the

property mortgaged. There was also a subsequent mortgage on the entire road, its franchises and rolling stock. The court held that the company might assign particular parts of its rolling stock used over its whole line to separate divisions, and mortgage such parts with the division to which it was assigned; and that whether they did so was a question of intention. In the majority opinion, the question of the rolling stock being affixed to the realty was not discussed, and the decision was placed on the language of the mortgages as decisive of what was intended to be covered by them under their descriptive words. The judges who expressed opinions that the rolling stock was a fixture, dissented, holding that such rolling stock, being purchased by the common funds of the company, and fitted for use over the whole line, as a fixture, was attached to the whole line, and not to any part or division of it. The case is reconcilable with legal principles only on the assumption that the rolling stock was personal property, and was mortgaged as such.

In *Railroad Company* v. *James*, 6 *Wall.* 750, the case rested on a statute of Wisconsin, which declared that " all rolling stock of any railroad company used and employed in connection with its railroad shall be and the same is hereby declared to be fixtures." (*R. S. Wis.* 511, § 34.) The *dictum* of the judge delivering the opinion of the court, who was one of the dissenting judges in *Minnesota Co.* v. *St. Paul Co.*, *supra*, that the rolling stock would have been fixtures independent of the statute, was merely *obiter*.

In *Scott* v. *C. & S. R. R. Co.*, 6 *Bissel* 529, the sole question was, whether a mortgage made by a railroad company, covering all after-acquired property, included after-acquired rolling stock. The judge, after reviewing the cases in the supreme court of the United States, held that it did, and declared, in his opinion, that it did not make any difference in the result, whether the property was real or personal.

In *Farmers Loan and Trust Co.* v. *St. Jo., &c. R. R. Co.*, 3 *Dillon* 412, the mortgage expressly covered the rolling stock and other property appertaining to the railroad. It had been recorded as a mortgage of lands, but not as a chattel mortgage under the law of Kansas. The rolling stock having been seized under execution, the question was one of registry. The opinion of the court, by Justice Miller, is quite short, and holds that rolling stock and other property, strictly and properly appurtenant to the road, is part of the road, and covered by the mortgage in question, which in terms embraced the rolling stock, and that it need not be recorded as a chattel mortgage to give it priority over executions. Under the language of the mortgage there could be no doubt that rolling stock was covered by it, and the report does not show whether the registry was deemed sufficient on the ground that the rolling stock was a fixture, or for the reason that, as chattels, it was such property as not to come within the purview of the Kansas statute. At all events, I am not inclined to give this case the effect of a direct decision of the moot question of such weight as to settle the law in the federal courts.

The cases cited from the state courts are chiefly such as decide that a mortgage of after-acquired goods and chattels is valid, or such as hold that such property, when mortgaged, is not liable to be taken under certain kinds of process, under rules of procedure peculiar to the practice in such states. *P. & W. R. R. Co.* v. *Woelpper*, 64 *Pa. St.* 366, and *Cowry* v. *P. & T. W. R. R. Co.*, 3 *Phila. R.* 173, are cases of that kind. Where the question has been directly presented, whether the rolling stock of a railroad, included in a mortgage, of its road-bed and franchises, is real or personal property, the great weight of authority is in favor of its being considered as personalty. *Stevens* v. *B. & C. R. R. Co.*, 31 *Barb.* 590; *Beardsley* v. *Ontario Bank, Id.* 619; *Bermont* v. *P. & M. R. R. Co.*, 47 *Id.* 104; *Randall* v. *Elwell*, 52 *N. Y.* 521; *Hoyle* v. *Plattsburgh R. R. Co.*, 54 *N. Y.* 314; *Chicago, &c. R. R. Co.* v. *Howard*, 21 *Wis.* 44; *B. C. & M. Co.* v. *Gil-*

more, 37 N. H. 410; Coe v. Columbus R. R. Co., 10 Ohio St. 372; City of Dubuque v. The Ill. Cent. R. R. Co., 37 Iowa 56. In this state the point was directly decided by the supreme court in State Treasurer v. S. & E. R. R. Co., 4 Dutch. 21, where it was held that the phrase, " road and equipments," in a railroad charter, did not include its rolling stock; and, in the opinion of Chief Justice Green, engines and cars were declared to be no more appendages of a railroad than wagons and carriages were appendages of a highway—both were equally essential to the enjoyment of the road—neither constituted any part of it. Furthermore, the third section of the act of March 24th, 1869, which is now the thirty-eighth section of the act concerning mortgages (Rev. p. 709), contains a plain legislative recognition of the rolling stock of railroads as chattels—to be considered as such when covered by mortgage. And in practice the engines and cars of railroad companies have frequently been seized under execution and distrained for taxes, as personal property, without any scruple as to their liability to seizure and sale as such.

One of the primary objects of law is the classification of property and the establishment of certain indicia by which its ownership may be determined. For this purpose all property is by law divided into two kinds, real and personal, and the mode of enjoyment and methods of disposition are regulated by positive rules of law, which are founded on considerations of public policy, and established for the purpose of determining the ownership of property according to its kind. The method of transmuting property, personal in its nature, into realty, is as fixed and established in the law as the method of testamentary disposition. Such property does not become realty by mere use in connection with land. The implements of husbandry, though used only for agricultural purposes, do not thereby become part of the land. Nor will such property become realty by being included in a mortgage with lands any more than lands will become personalty by such an association. The stock of goods in a store, or the furniture in a hotel, do not become part of the

lands, although mortgaged or conveyed with the premises on which they are situate.

The criterion for determining whether property ordinarily regarded as personal becomes annexed to and part of the realty, is the union of three requisites : First—Actual annexation to the realty or something appurtenant thereto. Second—Application to the use or purpose to which that part of the realty with which it is connected is appropriated. Third—The intention of the party making the annexation to make a permanent accession to the freehold. *Teaff* v. *Hewitt,* 1 *Ohio St.* 511. This criterion was adopted by the chancellor in *Quimby* v. *Manhattan Cloth Co.,* 9 *C. E. Gr.* 260, and by this court in *Blancke* v. *Rogers,* 11 *Id.* 564, and by the court of appeals of New York in *McRea* v. *Central Nat. Bank,* 66 *N. Y.* 489.

Whether a chattel is a fixture or not depends upon the facts. The mere intention of the parties to make it part of the freehold does not make it a fixture. To accomplish that result there must be an actual annexation to the freehold, though the strength of the union is not material if in fact it be annexed. The intent of the party affixing it is only important on the question whether he intended to make the chattel so annexed a temporary or a permanent accession to the freehold. *Rogers* v. *Brokaw,* 10 *C. E. Gr.* 497 ; *S. C. sub nom. Blancke* v. *Rogers, supra.* Cases of what is called constructive annexation are only apparent exceptions to this rule. The instances of constructive annexation such as the keys, doors and windows of a house removed for a temporary purpose, a millstone taken out of the mill to be picked, and saws and leather belting taken out to be repaired or laid aside for future use, and the like, are all cases where the chattel, by actual annexation, was once part of the realty and had been detached for temporary purposes without the intent to sever it from the freehold. Having once been part of the realty, removal temporarily without intent to sever permanently does not reconvert the chattel into personalty, and destroy its character as a fixture.

*Ewell on Fixtures* 43. This is all that is meant by constructive annexation. Cases of this description do not militate against the rule that actual annexation is the condition under which a chattel in the first instance becomes part of the realty; and while the degree of annexation is unimportant, it will be found that the attachment to the realty is invariably such as to give a fixedness in location or localization in use.

The illustrations of doves in a cote, deer in a park, and fishes in a pond, are entirely inapplicable to the present subject. They go with the inheritance for special and peculiar reasons. In *Amos & Ferrard on Fixtures,* they are classified under the head of heir-looms, a class of property entirely distinct from fixtures. *A. & F. on Fixtures,* 168. Sir Edward Coke assigns them to go with the inheritance, because they are animals *feræ naturæ,* " and could not be gotten without industry, as by nets and other engines." *Co. Lit.* 8a. This is the true foundation of the common law rule, for Wentworth saith that "young pigeons, being in the dove-house, not able to fly out, go to the executor; yet their dams, the old ones, shall go to the heir with the dove-house" (*Went. Off. Ex.* 143); and fishes confined in a trunk or the like go to the executor. *Co. Lit.* 8a. In *Paulet* v. *Gray,* fishes in a pond were adjudged to belong to the heir, for the reason that "they are as profits of the freehold which the executor shall not have, but the heir, or he who hath the water." *Cro. Eliz.* 372. No analogy exists between these animals and machinery, such as engines and cars, by which the legal status of the one can be deduced from that of the other.

The criterion above stated of actual annexation to the freehold, as a rule for determining when chattels become part of the realty, is as well settled in this state as any other rule of property. Exceptions founded on fanciful and groundless distinctions only tend to produce uncertainty and confusion in the rules of property, which should be permanent and uniform. " The general importance of the rule,"

says Judge Cowan, "which goes upon corporal annexation, is so great that more evil will result from frittering it away by exceptions than can arise from the hardship of adhering to it in particular cases." *Walker* v. *Sherman*, 20 *Wend.* 656.

Tested by the foregoing criterion, it is manifest that the rolling stock of a railroad must be regarded as chattels which have not lost their distinctive character as personalty by being affixed to and incorporated with the realty. It is true that engines and cars are adapted to move on the track of the railroad, and are necessary to transact the business for which the railroad was designed. But unattached machinery in a factory, the implements of husbandry on a farm, and furniture in a hotel, are similarly adapted for use in the factory, on the farm, or in the hotel, and are equally essential to the profitable prosecution of the business in which they are employed. When regard is had to the fundamental and necessary condition under which the law permits chattels to become part of the realty, engines and cars and the rolling stock of a railroad utterly fail to answer the requirement of the law. Cars which left Jersey City this morning, before the close of the succeeding week will be found scattered over the west or on the Pacific coast, their places in transportation through this state being supplied by cars gathered from the railroads of other companies, many of which are located in other states. The suggestion that each one of these cars carries with it the attribute of realty in its journey through other states, or even over other railroads in this state, will show the incongruity of denominating that a fixture which, in its ordinary use, travels over other railroads, and is connected with the railroad of its owner in no other way than in its useful employment in the business in which the company is engaged. In *Randall* v. *Elwell*, *supra*, Judge Grover says: "I think no one would claim that a car of the New York Central which, in the course of business, had been run to Chicago, was part of its real estate while there; and, if not such, I can discover no principle upon which the character of the property

should be changed when it reaches the Central track on its return trip to New York." After an examination of all the cases on the subject, Mr. Ewell declares it to be the better opinion, and one supported by the weight of authority, that the rolling stock of a railroad is simply personalty, and not a fixture.    *Ewell on Fixtures* 39.

Having reached the conclusion that the rolling stock of a railroad is personal property, the next inquiry will be, whether a mortgage of such property is within the provisions of the statute requiring such mortgages to be filed.

In this state the legislative policy is to require the registry or filing of mortgages of all property which is visible and tangible, and to postpone the lien of every mortgage not registered or filed as prescribed by law, to the claims of third persons, the creditors of the mortgagor and subsequent *bona fide* purchasers or mortgagees. This is apparent from an inspection of the statute (*Rev.* pp. 705–9). The seventeenth and twenty-seventh sections provide for the registration of mortgages of lands, tenements and hereditaments; the thirty-ninth and fortieth provide for the registry or filing of mortgages of goods and chattels. The language of the sections relating to chattel mortgages is too clear to permit a doubt as to the legislative meaning. Its language is : "Every mortgage or conveyance intended to operate as a mortgage of goods and chattels, not accompanied by an immediate delivery, and followed by an actual and continued change of possession, shall be," &c. Giving the words of this statute their primary and legal signification, which is the cardinal rule for the construction of statutes, this section must be construed to apply to all mortgages of property such as is comprised under the description of " goods and chattels," as distinguished from lands. Such a construction was made of the statute of New York, which, in this respect, is in the same words as our act; and the act was held applicable to mortgages of the rolling stock of a railroad in connection with its lands.    *Stevens* v. *B. and N. Y. R R. Co.,* 31 *Barb.* 590; *Bement* v. *P. and M. R. R. Co.,* 47

*Barb.* 104; *Hoyle* v. *P. and M. R. R. Co.*, 54 *N. Y.* 314. The court cannot interpolate any qualification of the plain language of the statute upon any supposed inconvenience arising from its application to any particular class of property which is within the operative words of the act. That should be left to legislative action, as it was by the courts of New York. The question there has been set at rest by a statute excepting out of the operation of the chattel mortgage act mortgages by railroad companies on real and personal property which have been recorded as mortgages of real estate. *N. Y. St.* 1868, ch. 779.

In this state an act was passed in 1876, relating to the registry of mortgages given by certain corporations, providing that nothing in any of the laws of this state shall be held to require the filing of record of any mortgage given by any such corporation conveying the franchises, and including chattels then or thereafter to be possessed and acquired, if such mortgage shall be duly lodged for registry as a conveyance of real estate. (*P. L.* 1876, p. 307, § 4.) The legal construction of the act we need not now consider.

The rights of the iron and coal company in the property in controversy were fixed and became vested rights in January, 1874, when the levy was made under the executions. By the act concerning executions, the property was bound by the execution from the time of delivery to the sheriff, and upon levy made, title under the execution would be good, even as against subsequent *bona fide* purchasers (*Rev.* p. 392, §§ 18, 20). By force of the last-mentioned act, and the act concerning chattel mortgages, as it then stood, the iron and coal company, upon the levy being made, acquired a right in the property seized under its execution superior to that of the complainant under his mortgage. That right of priority, being a vested right, was not divested by the act of 1876.

The general rule is, that all statutes shall have a prospective effect only. " Words in a statute," says Justice Paterson, " ought not to have a restrospective operation, unless they

are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot otherwise be satisfied. This rule ought especially to be adhered to when such a construction will alter the pre-existing situation of the parties or will affect their antecedent rights, services or remuneration, which is so obviously improper that nothing ought to uphold and vindicate the interpretation but the unequivocal and inflexible import of the terms, and the manifest intention of the legislature. *United States* v. *Heth*, 3 *Cranch* 399–413. This rule of construction has been repeatedly enunciated and enforced by the courts of this state. *Den* v. *Van Riper*, 1 *Harr.* 7; *Jones* v. *Morris Aqueduct Co.*, 7 *Vr.* 206; *City of Elizabeth* v. *Hill*, 10 *Vr.* 556.

The protection of vested rights in property from being destroyed or impaired by after-legislation, has been placed on firmer grounds in this state. By the third section of the act relating to statutes, it is declared that the repeal of any statutory provision " shall not affect or impair any act done or right vested or accrued    *    *    before such repeal shall take effect; but every such act done, or right vested or accrued,    *    *    shall remain in full force and effect to all intents and purposes as if such statutory provision, so repealed, had remained in force." (*Rev.* p. 1120, § 3.) This statute is only declarative of the law as judicially pronounced in *Hunt* v. *Gulick*, reported in 4 *Hal.* 205.

Indeed, a right partaking of the nature of property, such as became vested in the Iron and Coal Company upon the levy of its execution, is clearly within the principle of the constitutional provision which protects private property from legislative action, and forbids its being taken without compensation for either public or private purposes. This constitutional protection is thrown around property of every kind and description, and is not restricted to any particular mode of taking. A partial destruction or diminution in value is a taking within the meaning of the constitutional provision. *Glover* v. *Powell*, 2 *Stock.* 212; *Hale* v. *Lawrence*,

1 *Zab.* 248, 714; *Trenton Water Power Co.* v. *Raff,* 7 *Vr.* 335. If the levy had been upon lands, instead of goods and chattels, a subsequent act of the legislature depriving the plaintiff in execution of his lien thereon, or impairing the value of his priority by substituting a subsequent encumbrancer in his place, would be so plainly an invasion of his right in the property as to be undeniably within the constitutional prohibition. If it might be done after the lien of the judgment attached, it would be equally competent for the legislature to do so after the title had actually passed by a sale and conveyance under the execution. The same principle must be applied to a levy on goods and chattels.

Nor is the form of the legislative change in the law a matter of any consequence. Whether it be in the shape of a legislative construction of a pre-existing statute, or a positive enactment retrospective in terms, the substance of the thing only will be regarded. What may not be done directly in one way, cannot be done by indirection in the other way.

The act of 1876 itself does not necessarily require a retrospective construction, and therefore will not be allowed that effect; and if the language used required such a construction, it could not be effective to deprive a party of prior vested rights acquired under the levy.

Another point made on the argument was, that even if the rolling stock of a railroad be goods and chattels, and a mortgage thereof be required to be registered or filed by the chattel mortgage act, the complainant having taken actual possession of such property before the judgment of the Lackawanna Iron and Coal Company was recovered, the complainant's mortgage is entitled to priority over the judgment. The mortgage was made on the 14th of September, 1869, and possession of the rolling stock was not taken by the mortgagee until January 1st, 1874. The mortgage was not accompanied by an immediate delivery of the property mortgaged, but possession was taken before the judgment was recovered.

There is a distinction made in the statute between the creditors of the mortgagor and subsequent purchasers or mortgagees, with respect to the avoidance of the mortgage for neglect to file the same, or to take immediate possession. Purchasers or mortgagees, in order to take advantage of the failure of another mortgagee of chattels to comply with the statute, must be subsequent purchasers or mortgagees, taking their title under the mortgagor in good faith. A purchaser or mortgagee acquiring his rights with notice of the existence of the antecedent mortgage, does not obtain his title in good faith. Consequently possession taken of the mortgaged property under a prior chattel mortgage, however long postponed, will give it priority over a subsequent purchase or mortgage, if possession be taken in fact before such subsequent sale or mortgage was made. But no such qualifications apply as against the creditors of the mortgagor. Their rights may have accrued prior or subsequent to the mortgage, and yet they will be entitled to the benefit of the statute. Knowledge of the existence of a chattel mortgage executed by the debtor will not preclude a creditor from availing himself of the objection that the mortgage is void because it was not accompanied by immediate delivery of the things mortgaged, followed by an actual and continued change of possession. *Thomas on Mortgages*, 505; *Farmers Loan and Trust Co.* v. *Hendrickson*, 25 *Barb.* 485; *Stevens* v. *Buffalo and N. Y. R. R. Co.*, 31 *Barb.* 590; *Thompson* v. *Van Vechten*, 27 *N. Y.* 568. The distinction between creditors and subsequent purchasers or mortgagees in this respect was recognized in the opinion of this court in *National Bank of Metropolis* v. *Sprague*, 6 *C. E. Gr.* 530. The chancellor's construction of the statute holding that possession of the chattels mortgaged, taken before judgment recovered, will not give validity to the mortgage as against the execution creditor, if the mortgage was not filed according to the provisions of the act, and there was not an immediate delivery and continued change of possession of the things mortgaged, was correct.

Williamson *v.* N. J. Southern R. R. Co.

Upon a careful consideration of the subject, I am constrained to dissent from the views of the chancellor in holding the rolling stock of a railroad to be part of the realty, and that the complainant's mortgage, so far as it covered such property, was not within the provisions of the act concerning chattel mortgages, as the act stood when the rights of these parties became fixed. In my judgment, property of that kind must, under the law as established in this state, be regarded as goods and chattels, and a mortgage thereon be subject to the provisions of the act relating to mortgages of property of that description. The complainant's mortgage, so far as concerns the rolling-stock and other personal property subject to it, must be postponed to the judgment of the Lackawanna Coal and Iron Company.

The decree appealed from should be modified to conform to this opinion, and to that end must be reversed, and the record remitted to the court of chancery, with directions accordingly.

The Lehigh Car Company and the Lackawanna Iron and Coal Company having succeeded on their appeals, are entitled to costs in this court. Both parties having appealed from that part of the decree that related to the claim of Berthoud & Co., and neither succeeding on the appeal, the affirmance in that respect is without costs. The costs of the complainant in this court to be considered as costs in the cause, payable out of the proceeds of the sale of the property generally.

                                    Decree unanimously reversed.