Mr. Justice BRADLEY
 

 delivered the opinion of the court.
 

 The first objection made by the defendants to the decree
 
 *474
 
 is, that the mortgages under which the complainants claim are not valid for want of capacity in the railroad company to make them. It is admitted that the charter authorizes the company to mortgage certain real estate, which it was authorized to acquire for the purpose of aiding in the construction or maintenance of the road. But they insist that this power applies to outside real estate procured as ancillary to the main design of building the road, and does not apply to the l’ight of way and track of.the railroad. But we think it is general, and applies to any real estate which the company might acquire in any way. This construction is aided by the other powers conferred by the charter, as that of borrowing money on bond or note, and of doing all acts necessary and proper for or incident to the fulfilment of their obligations, And it is expressly declared that all conveyances and contracts executed in writing, signed by the president and countersigned by the treasurer, or any other officer duly authorized by the directors, under seal of the company, and in pursuance of a vote of the directors, shall be valid and binding. If it were necessary to look into the charter for express power to borrow money and mortgage its property to secure the payment thereof, we think the power is found therein.
 

 But the defendants contend that if the power to mortgage mere real and personal estate be conceded, still there is no power to mortgage, or in any way to assign the railroad as such, or the franchise of operating it and taking tolls, or any other franchise, much less that of exercising corporate powers; and hence the decree is erroneous in authorizing a sale of these rights and franchises under the mortgages.
 

 Without examining how far the operative effect of a mortgage executed by a railroad company upon its road, works, and franchises may extend,
 
 per se,
 
 without statutory aid, it is sufficient to say that, in our opinion, the legislature of Texas has validated the mortgages, and given them the effect which, by their tenns, they were intended to have. By the act of December 19, 1857,
 
 *
 
 section 4912, it is expressly provided that
 

 
 *475
 
 “The road-bed, track, franchise, and chartered rights and privileges of any railroad company in this State shall be subject to the payment of the debts and legal liabilities of said company, and may be sold in satisfaction of the same, but. . . shall be deemed an entire thing, and must be sold as such; and in case of the sale of the same, whether by virtue of an execution, order of sale,
 
 deed of trust, or any other power,
 
 tbe purchaser or purchasers at such sale, and their associates, shall be entitled to have and exorcise all the powers, privileges, and franchises granted to said company by its charter, or by virtue of the general laws of this State; and the said purchaser or purchasers and their associates shall be deemed and taken to be the true owners of said charter and corporators under' the same, and vested with all the powers, rights, privileges, and benefits thereof, in the same manner and to the same extent as if they were the original corporators of said company.”
 

 The following section, 4918, enacts that
 

 “ Whenever a sale of the road-bed, track, franchise, and chartered rights and privileges of any railroad company is made by virtue of any deed of trust or power, the same shall be made at the time and place mentioned in the deed of trust or power, and in accordance with the provisions of the same, as to notice and in other respects; and if the same be not specified, such sale shall be made as hereinafter provided for sales under execution or order of sale.”
 

 The following section, 4914, gives the like effect to sales under execution issued upon a judgment. Indeed, it is by virtue of the latter section that the defendants claim to be the present owners of the road and its franchises. This law is not prospective, but general in its operation. It.is a remedial law for the benefit of creditors, and should be liberally construed. It should especially be applied to a case in which, by the very terms of the trust-deed, all the franchises and rights of the company are expressly embraced therein. It cannot be claimed, as is done by the defendants, that a sale under one mortgage or judgment, by virtue of this law, nullifies and destroys all prior mortgages. Such a doctrine would work the greatest injustice, and would open
 
 *476
 
 the door to the grossest frauds. A sale under a junior security nuist be subordinate to one that is prior and paramount. Successive sales of the same franchises can no more be deemed incompatible than successive sales of the same property; and we all know that a sale of land under a judgment does not, in the slightest manner, affect a prior mortgage. A subsequent sale of the same land may be made by virtue of the latter.
 

 It is next objected that the mortgages were not properly executed, because the meetings of the directors by which the mortgages were authorized to be executed were held in the city of New York. It is not denied that the mortgages were executed in good faith under the corporate seal, and signed by thé president and countersigned by the treasurer of the company, and duly recorded in the proper offices of registry in the State of Texas. Supposing the complainants to be
 
 bond fide
 
 holders of the bonds held by them, the question raised by this objection amounts to this: Can a corporation repudiate a mortgage, given to secure its bonds held by
 
 bond fide
 
 holders, on the ground that its directors authorized its execution by a resolution passed outside.of the limits of the State, the mortgage being, in other respects, executed and recorded in due form of law ? Can it take all the benefit of the transaction, get off its bonds on the business community, and then repudiate its mortgage for such a cause ? '"We have not been referred to any case like this. It would seem, at first blush, to be a very hard rule, if such a rule exists. No doubt it may be true, in many cases, that the extra territorial acts of directors would be held void, as in the case cited from the 14th New Jersey Chancery Reports, 383, where a set of directors of a New Jersey corporation met in Philadelphia, against a positive prohibitory statute of New Jersey, and improperly voted themselves certain shares of stock. And other cases might be put where their acts would be held void without a prohibitory statute; and ‘it is generally true that a corporation exists only within the territory of the jurisdiction that created it. But it is well settled that a corporation may, by its agents, make contracts
 
 *477
 
 and transact business in another territory, and may sue and be sued therein. It may hold land in another territory so long as the local authorities do not object. And we see no reason why it should not be estopped by the action of its directors in another territory, when that action is the basis of negotiations by which third parties have
 
 bona fide
 
 parted with their money and the company has received the benefits of the transaction. A contrary doctrine would authorize a company to take advantage of its own -wrong, and would seriously impair the negotiability and value of such securities. Must a person, purchasing railroad bonds in Wall Street or Walnut Street, first send to Illinois, California, or Texas, to see whether the meeting of the directors which authorized the mortgage given to secure the bonds was held in a proper place? Whoever may, under supposable circumstances, raise an objection of this kind,, it ought not to lie in the mouth of the company to raise it. And, if the company are estopped, then those who purchase the property of the company at an execution sale must be estopped. It has frequently been held that such a purchaser takes only the right, title, and interest which the debtor had, subject to the equities which existed against the property in his hands when the judgment was recovered.
 

 But it is objected that the complainants are not
 
 bond fide
 
 holders of the bonds in their possession; that many of the bonds were issued improvidently, and against stipulations contained in the mortgages, to the effect that they should only ^»e issued to retire the previous issue of bonds. If this were true with regard to some of the bonds, it is not pretended to be true with regard to all of them; and the question, what particular bonds were wrongfully issued, if a material question, is properly examinable in the master’s office, where all bonds are to be presented and passed upon, if not already done. And the decree will stand only for the benefit of such bonds as appear to be entitled to its benefit; and this benefit will not be confined to the complainants’ bonds, but will be extended to all bonds that may be presented.by other holders. But it does not appear, so far as we have
 
 *478
 
 been able to scrutinize the evidence, that the complainants are not
 
 bond fide
 
 holders of their bonds. They have been examined, and have produced their bonds, and have told how they procured them, namely, by purchase, and what they gave for them; and they allege that they purchased them in good faith in the open market, supposing them to be valid obligations of the company, and being told that they were. If such is the fact, and no proof
 
 to the
 
 contrary occurs to us, we do not see why the complainants must not be held to be
 
 bond fide
 
 holders for value of the said bonds.
 

 The next objection we shall notice is, that the complainants have no right to sue for themselves and in behalf of the several classes of bondholders under the different mortgages, because the interests of these classes are antagonistic to each other. They are no more antagonistic to each other than the several bondholders of the same class are. It is the interest of each bondholder to have as few prior claims to his, and as few participants with him as possible. Every co-bondholder is, in one sense, an antagonist. But the objection is entirely without foundation. The complainants do, in fact, hold bonds of the three different classes, and they have a perfect right to state that fact in their bill, and to pray relief suitable to the fact, and no possible harm or inconvenience can arise in their suing in behalf of themselves and all other bondholders in each class according to their several priorities. If any class of bondholders wish to contest the precedency of a prior mortgage, they have a perfect right to intervene in the suit and file a cross-bill setting up. the matter of objection. All bondholders, including the complainants themselves, have to establish their claims in the case' before it is finally closed, and before a distribution of the assets can be made. And any bondholder proving his claim may contest the claim of any other bondholder. It has even been held that a mortgagee may sue on behalf of himself and all other creditors, notwithstanding he claims a right to prior satisfaction out of the mortgaged property.
 
 *
 
 
 *479
 
 And Judge Story says that, on principle, it is not easy to see why it might not be sufficient, in a suit by incumbrancers, to file the bill on behalf of all the creditors and incumbrancers ; thus making them all, in a sense, parties to the extent of asserting their own rights, or of enabling them to contest the matter before a master. He says that this seems to be the true doctrine inculcated by the more recent authorities.
 
 *
 
 But the case before us is much stronger than this. The complainants
 
 mast
 
 set out their own claims under the different mortgages, and it would be impossible to make all the bondholders of either class parties, for they could not be discovered; and the rights of all are protected by the opportunity given to all to contest the claim of any. We consider the bill as properly conceived, and the objection as untenable.
 

 In connection with this objection it is proper to notice an objection to the original decree, that it undertook to declare and find the amount of bonds outstanding and due under each mortgage before the bonds had been regularly produced and proved. That decree, of course, is not to be regarded as final and conclusive on this point. The remarks of Vice-Chancellor Wigram, in
 
 Whitaker
 
 v. Wright,
 
 †
 
 are germane to this subject: “ With respect to the form of a decree in a creditor’s suit,” says he, “ the court does not treat the decree as conclusive of the debt. It is clear that it is not so treated for all purposes, for any other creditor may challenge the debt, and it is equally clear that in practice the executor himself is allowed to impeach it. If, in a case where' the plaintiff sues in behalf of himself and all other creditors, and the defendants, who represent the estate, do not admit assets, it is objected at the hearing that the debt is not well proved, the court tries the question only whether there is sufficient proof upon which to found a decree; and however clearly the debt may be proved in the cause, the decree decides nothing more than that the debt is sufficiently proved to entitle the plaintiff to go into the master’s office,
 
 *480
 
 and a new case may be made in the master’s office, and new evidence may be there tendered.”
 
 *
 
 In this case, it is true, no reference to a master was made in the first decree for taking the proof of the various bonds that might be produced ; but the final decree directed that to ascertain the proportion and amount of the several series of bonds and coupons outstanding, all holders thereof claiming participation in the distribution of proceeds of any sale of the property should present their bonds and coupons to the court, to be deposited in some bank to be designated, there to remain subject to further order, and [o such directions as the court may make to ascertain their genuineness, and to classify them. This has not yet been done, all proceedings being stayed by the appeal. But the action of the court, as far as it has gone, is substantially correct. It only remains to complete the proceeding in accordance with the proper practice applicable to the case.
 

 On the part of Robert Pulsford it is objected that the decree does not give him a priority on that, portion of the road which was laid with his iron. He contends that he is entitled to this, first, • because when the mortgages of the complainants were executed it was not in existence, and. could not have been conveyed thereby, and can only be embraced therein on a principle of equitable estoppel, which is rebutted when it comes in conflict with a superior equity ; secondly, because his capital applied to the road conserved it, and rendered it capable of being operated, which it would not have been otherwise; hence, on the principle adopted by the civil and maritime laws of awarding priority to the last creditor who furnished necessary repairs and supplies to a vessel, he is entitled to priority. The counsel for Pulsford has furnished Yis with a very ingenious and learned argument on these points; but we cannot yield to their force.
 

 As to the first point, without attempting to review the many authorities on the subject, it is sufficient to state that, in our judgment, the first, second, and third deeds of trust,
 
 *481
 
 or mortgages, given by the Galveston Railroad Company to the trustees, estops the company, and all persons claiming under it and in privity with it, from asserting that those deeds do not cover all the property and rights which they profess to cover. Had there been but one deed of trust, and had that been given before a shovel had been put into the ground towards constructing the railroad, yet if it assumed to convey and mortgage ihe railroad, which the company was authorized by law to build, together with its superstructure, appurtenances, fixtures, and rolling stock, these several items of property, as they came into existence, would become instantly attached to and covered by the deed, and would have fed the estoppel created thereby. No other-rational or equitable rule can be adopted for such cases.. To hold otherwise would render it necessary for a railroad company to borrow money in small parcels as sections of the-read were completed, and trust-deeds could safely be given thereon. The practice of the country and its necessities are-in coincidence with the rule. The precise case arose in New Jersey thirty years ago. The Morris Canal Company mortgaged its canal, appurtenances,and chartered rights to secure a loan. When the mortgage was given, one section of the canal, that between Newark and Jersey City, although authorized, was not constructed. It was constructed after-wards. Two other mortgages were given upon that part of the canal, one of which was held by the State of Indiana. A bill of foreclosure was filed on the first mortgage, and after argument by very able counsel, Chancellor Pennington held that the first mortgage took priority. The objection was raised that the company did not own any of the land on which the contested portion was constructed when the mortgage was given. “ Can it be possible,” said he, “ that if on the-line of the route at any place it should turn out that a deed was obtained for a piece of land since the execution of th& mortgage, that such part of the canal is not embraced within it?”
 
 *
 
 Mr. Pulsford, as holder of the fourth mortgage, is-
 
 *482
 
 an assignee of the railroad company, claiming under it, with full notice of the other mortgages. He is in privity with the company, and is bound by the estoppel.
 

 As to the other point, giving priority to the last creditor for aiding to conserve the thing, all that is necessary to say is that the rule referred to has never been introduced into our laws except in maritime cases, which stand on a particular reason. We do not understand that it is. a part of the general law of Texas. By an act of the Congress of Texas, passed 20th January, 1840, the common law was made the rule of decision, whei'e not inconsistent with the Constitution and acts of Congress. By the common law it is an inflexible rule, that whatever is affixed to the freehold becomes a part of the realty, except certain fixtures erected by tenants, which do not affect the question here. The rails put down on the company’s road became a part of the road. The road itself was iucluded in the mortgages of the complainants. Pulsford, by allowing his property to go into or become part of the road, consented to its being covered by the mortgages in question. He acquired no lien which can displace them. In certain States a lien is created by statute .in favor of mechanics, called the mechanics’ lien, by which a person furnishing, materials or work on a building'.acquires a lien on the property to secure the payment of his claim. But this kind of lien did not exist in Texas in favor of those who supplied materials or money for constructing railroads. We have no hesitation in saying that Pulsford’s claim to priority cannot be maintained.
 

 Some other minor points have been made by the defendants which it is not necessary for us to examine in detail. Our conclusion is that the decree, so far as it is in favor of. the complainants, must be affirmed.
 

 The complainants have also appealed from the decree because it fails to award them the tolls, income, and profits of the railroad during the time it was operated by the present defendants, and to make the defendants accountable therefor. The complainants claim that nearly all the rolling stock and property, including the junction railroad, claimed
 
 *483
 
 by the defendants as their property, were really produced by the earnings of the railroad fraudulently appropriated to themselves by the defendants. This claim raises the question whether a mortgage of the tolls and income makes the mortgagor or his assignees accountable therefor before demand made by the mortgagee. In this case"it does not appear that the complainants or their trustees made any demand for the tolls and income until they filed the present bill. The bill itself does not contain any allegation of such a demand. Now what is the language of the deeds of trust ? They convey, it is true, with the other premises, the tolls, income, issues, and profits, whenever the company shall be in default of payment; but a subsequent clause provides that in case the company shall at any time for the space of three months be in default in respect to the payment of either interest or principal of said bonds when due and demanded,, on request in writing of any of the holders of the bonds, the trustees shall take possession of the railroad and other property, and through the agency of the persons they may appoint, shall collect and receive the tolls, incomes, and profits of the railroad and mortgaged property for'the purpose of the security before declared, and may sell the road upon giving due notice, &c. It seems to us that the latter clause defines and points out the manner in which the pledge of the tolls and income is to be practicably carried into effect. At all events until a regular demand were made for the payment of the tolls and income we do not think, under the language of the deed, that the defendants were bound to account therefor. If this be so, it matters not what bargains the defendants made between themselves as to the disposition of said tolls and income.
 

 We are, therefore, of opinion that this part of the decree ought also to be affirmed. The result is that the entire decree of the Circuit Court is
 

 Affirmed.
 

 *
 

 Paschal’s Digest, art. 4912.
 

 *
 

 See Story’s Equity Pleading,
 
 §§
 
 101,158.
 

 *
 

 See Story’s Equity Pleading, J 158; Equity Jurisprudence, § 549.
 

 †
 

 2 Hare, 310.
 

 *
 

 See Story’s Equity Jurisprudence, ¡3 549, note.
 

 *
 

 3 Green’s Chancery, 402.