### YOUNG v. NORTHERN ILLINOIS COAL & IRON CO.

*(Circuit Court, N. D. Illinois.* February, 1880.)

1. MORTGAGE—INCOME OF MORTGAGED PROPERTY.
    Until the mortgagee of an insolvent corporation takes possession in person or by receiver, the mortgagor is entitled to income derived from operating the same.

2. SAME—ASSETS—RIGHTS OF MORTGAGOR.
    A company indebted to its employes prior to the appointment of a receiver assigned to a creditor certain drafts drawn upon various corporations for the approximate amounts of their various indebtedness, and after the appointment of a receiver gave to the said creditor drafts upon the same corporations for the actual amounts due. *Held,* that the mortgagor had the right to pledge or assign such drafts, they being assets of the mortgagor, to secure the creditor, and the assignment of the later drafts was but the consummation of the previous agreement, and was valid and passed the title to the creditor. That the mortgagor company, at the time of the appointment of the receiver, was largely in debt to its employes, and that the mortgagees advanced the sums necessary to pay off these debts, would not give them the right to the proceeds of the drafts as against the creditor.

In Equity. Bill to foreclose.

*Mattocks & Mason,* for petitioner.

*Lawrence, Campbell & Lawrence,* for respondent.

BLODGETT, D. J. The original cause is a bill in equity to foreclose a mortgage given by the Northern Illinois Coal & Iron Company to complainant's testator upon certain coal mines and coal lands situate in La Salle county, in this state.

The mortgageor continued in possession of the mortgaged property and operated its mines in the usual manner, by raising and selling coal therefrom, until after this bill was filed.

On the twenty-ninth day of July, 1876, an order was made in the cause appointing a receiver, and directing him to take possession of the mortgaged property, and to collect outstanding dues, demands, and accounts of the company.

On the first day of August the receiver gave bond and qualified, and on the second day of August he took possession of the mines and mining property.

It also appears that for several years prior to the appointment of the receiver the company had had dealings with the First National Bank of Mendota, mostly in the way of short loans of money and discount of drafts drawn by the company upon the persons and railroad companies to whom the coal company had sold coal, and I think the fair inference from the disclosed facts is that these drafts, when given, were treated rather as collateral security for the amounts advanced upon them by the bank to the company, than as an absolute transfer to the bank of the indebtedness against which the drafts were drawn, because the proof shows that the money due from customers on the drafts was often collected by the officers of the coal company and paid over to the bank, and on one or more occasions such money was retained and used by the coal company, and the bank paid from other sources by the coal company.

On or about the seventh day of July, 1876, the bank agreed with the officers of the coal company to discount, presumably, upon the basis of their former dealings, three drafts, to be drawn by the coal company, as follows:

| | |
|---|---:|
| On the Clinton, Dubuque & Minnesota R. Co. for - - - | $ 900 |
| On the Illinois Central R. Co., - - - - - | 2,000 |
| On the C., R. I. & P. R. Co., - - - - - - | 1,100 |
| | $4,000 |

Instead of taking these drafts to the bank to be discounted, after making the arrangement, the superintendent of the company took to the bank the notes of the company, indorsed by Col. Taylor, for $4,000.

The bank at first refused to discount these notes, but finally concluded to do so, provided the superintendent would write across the face of the notes, "To be paid in drafts on the respective roads," which was done, and the bank thereupon discounted the notes. At the same time the bank discounted for the company a note of the Chicago Stove Works for $291, and a note made by Warren, Clark & Co. for $523. The net proceeds of the $4,000 note and the two small notes, paid by the bank to the coal company, was $4,741, $1,608 of which was applied to the payment of indebtedness then due the bank from the coal company, and the balance of $3,133 was paid in cash to the coal company, and the money so obtained was applied

by the coal company to the payment, as far as it would go, of its laborers. Within a few days after this transaction, Col. Taylor returned from New York, when the $4,000 notes were taken up and three drafts drawn by the company, and indorsed by Col. Taylor and his wife, in favor of the bank, substituted in their place.

Draft July 7, 1876, at 30 days, on C. H. Booth, Treas. Clinton, D. & M.
R. Co., - - - - - - - - - $ 900
Draft July 7, 1876, at 30 days, on J. C. Willing, Treas. Illinois Central
R. Co., - - - - - - - 2,000
Draft of July 7, 1876, at 30 days, on W. G. Purdy, Treas. C., R. I. & P.
R. Co., - - - - - - - - - 1,100
                                                                    ———
                                                                    $4,000

And on the fourth day of August, 1876, four days after the receiver was appointed and qualified, the superintendent of the coal company delivered to the bank four drafts, as follows:

Draft dated August 1, 1876, due August 25th, on C. H. Booth, Treas.
C., D. & M. R. Co., for - - - - - - - $ 756 00
Draft dated August 1, 1876, due August 15th, on J. C. Willing, Treas.
Illinois Central R. R., for - - - - - - 1,539 30
Draft dated August 1, 1876, due August 15th, on W. G. Purdy, Treas.
C., R. I. & P. R. Co., for - - - - - - 1,356 20
Draft dated August 1, 1876, at 10 days' sight, on J. W. Parker &
Co., for - - - - - - - - 900 00

The last set of drafts drawn on the Illinois Central, Chicago, Rock Island & Pacific Railroad Company, and the Clinton, Dubuque & Minnesota Railroad Company, were for the actual amounts due from those companies to the coal company for coal delivered them by the coal company during the month of July.

The J. W. Parker & Co. draft was given to make up the full amount of the paper taken up, and notice was given the receiver of the giving of the new drafts.

At the time the receiver took possession there was no entry of these drafts upon the books of the coal company, but the amounts represented by them stood in the form of open accounts against drawees.

On the second day of August, Col. Taylor, as president of the coal company, called at the office of the Illinois Central Railroad Company and signed a receipt in full for the coal delivered in July, and requested that a check be sent the bank for the amount of the draft of August 1st.

The bank notified the treasurer of the Chicago, Rock Island & Pacific Company that draft had been drawn, by letter dated August 10th, and asked payment to bank, or that money be held by railroad company, subject to the decision of the court. None of these drafts were ever accepted on their face by the drawees thereof.

On the fourth day of August, 1877, an order was entered by this court directing that the drawees of these drafts should pay the several sums due from them to the coal company, to the receiver, without prejudice to the right of the bank to claim and receive said indebtedness from the receiver, in case the claim of the bank to said moneys, as set up in this intervening petition, should be established; and in pursuance of this order the amounts due from the Illinois Central Railroad Company, and from the Chicago, Rock Island & Pacific Railroad Company, to the coal company have been paid into the hands of the receiver.

It also appears that at the time the receiver took possession of the mines, the coal company was in arrears to its laborers for labor in the working and care of the mines to the amount of about $9,000, and that the receiver was, by order of the court, directed to raise the money and pay off this indebtedness by the issue of certificates, which should be a lien on all the assets of the coal company in the hands of a receiver.

It appears to me, upon more mature reflection, that the money advanced by the bank to the coal company on the transaction of July 7th was, in fact, advanced upon the faith that the bank was to be secured by the pledge of drafts upon these railroad companies,—a memorandum to that effect was made upon the $4,000 notes at the time,—and on Col. Taylor's return the notes were taken up and drafts given to the amount of the notes. These drafts were drawn for the assumed or approximate amounts of the coal bills which would be due to the coal company from the drawees, on the July accounts, because the coal for the month had not been delivered, and the exact amount of the accounts could not be then ascertained. Yet I think the facts show that these drafts were intended by the parties to operate as an equitable assignment to the bank of whatever should be due from the railroad companies to the coal company for coal delivered in July. That the coal company had the right to do this there can be no doubt. *Gilman* v. *Ill. & Miss. Tel. Co.* 91 U. S. 616; *Galveston R. Co.* v. *Cowdrey,* 11 Wall. 459.

Until the mortgagee takes possession of the mortgaged property, either in person or by receiver, the mortgageor has the right to the

income of the property. Especially is this true in case of a mortgage of property like this, which does not bear a fixed rental, but where the income is derived by working or operating the property, requiring a constant expenditure of money to make it productive.

The accounts due from the drawees of these drafts did not, in any sense, either legally or equitably, belong to the mortgagee. They belonged to the coal company, and its officers had the right to pledge them, even in advance, for the purpose of securing the means of carrying on the business of the company; and I have no doubt that the transactions between the parties were intended as a pledge or assignment of these accounts, and should be so considered by the court.

The notes for $4,000, given July 7th, and the first set of drafts, were evidently intended only as temporary securities, to stand until the correct amounts for which drafts should be drawn on each customer of the coal company could be ascertained, and the drafts of August 1st were only the consummation of the previous agreement of the parties.

It is quite clear, I think, that the bank could have held and collected these funds, as against the coal company, on the drafts of July 7th, given to take up the notes; and if it could have done so, then it can and should be allowed to hold and collect the indebtedness which those drafts represent as against the mortgagee; for, in respect to these claims, the receiver stands only in the tracks of the coal company, and must be bound by whatever binds that company.

It is urged that, inasmuch as the receiver found the coal company in debt to its miners, and was obliged to raise a large sum of money to pay off this indebtedness, a stronger equity attaches to this fund, in favor of the mortgagee, who was obliged to make the advances necessary to pay the men. But it must be remembered that this indebtedness to the bank, and that to the men, were both the debts of the coal company, and the demands represented by these drafts were assets of the coal company. Clearly, the coal company had the right to assign or pledge these claims to secure the debt due the bank, and the court must respect the right of the bank thus created. The coal company had in effect specifically appropriated these claims to the bank, and the appointment of the receiver cannot defeat rights which have thus been created. If these assets had come to the hands of the receiver unincumbered by any previous pledge or assignment by the coal company, I have no doubt the court could have directed their application to the payment of debts of the coal company incurred in the operation of the property, but the court cannot divest

rights to these funds which had accrued prior to the appointment of the receiver. Besides, it may be said that the mortgagee was under no legal or moral obligation to pay these laborers' claims. They were ordered paid because it was deemed expedient to do so, rather than incur the risk of a riot or strike by the employes of the mine.

Order that receiver pay to bank the sums collected on accounts due from the Illinois Central and the Chicago, Rock Island & Pacific Railroad Companies, and costs.