The opinion of the Court was delivered by
Bermudez, C. J.
This is an hypothecary action to enforce the payment of liquidated debts, amounting in capital to some $75,000, alleged to be secured by a judicial mortgage. The defense is, that long prior to the registry of the judgments which plaintiff claims t.o own, the real estate described in the petition liad been mortgaged to secure the payment of a large amount of bonds, ($8,000,000) and that, for some time previous to the same registry, the property had been in custodia legis, under proceedings in, rem, within the possession and control of a court of competent jurisdiction, which adjudicated said land to he subject to the mortgage, ordered its sale and distributed the proceeds, and that, the judgment creditors are concluded thereby.
From a judgment in favor of the defendants, the plaintiff appealed.
We deem it unnecessary to consider the issue raised touching the sufficiency of the evidence offered to prove the title of the plaintiff to the several judgments of which he claims to he the assignee, or touching the validity of that title. Conceding that the authentication charged against is by the proper authority, and that the plaintiff is not merely a stakeholder, hut the real creditor, we will proceed to examine the merits of the case on that hypothesis.
The evidence shows that the judgments which the plaintiff claims to own were rendered against the New Orleans, St. Louis & Chicago Railroad Company, and were registered in the mortgage office, two on May 1st, 1876, and ono on March 16th, 1877; that on May 1st, 1872, the New Orleans, Jackson & Great Northern Railroad Company, had consented a “ mortgage ” on all its property, acquired and to be acquired, to secure the payment of bonds for the sum of eight millions of dollars, half of which were cancelled, issued to withdraw two previous classes of bonds uttered for construction purposes, and also to provide means for repairing, improving and operating the road and running it to the Ohio river; that the act was afterwards duly recorded on the 25th of June, 1872, regarding property in Louisiana; that in 1874 the parcels described in the petition were still owned by the New Orleans, Jackson & Great Northern Railroad Company, which then consolidated with the Mississippi Central Railroad Company ; ■ that the new organization *787 tlien assumed the name of the New Orleans, St. Louis & Chicago Railroad Company, which succeeded the two Companies, acquiring all their rights and incurring all their obligations; that the parcels involved in this controversy had been acquired after the mortgage had been consented and before the registry of the plaintiff’s judgments; that one of them is the place in which the business of the corporation has been conducted since the year 1874, and that the other is a depot near the Mississippi river, both indispensable adjuncts.
In consequence of the non-payment of interest on the obligations issued under the act of mortgage, which was also a deed of trust, proceedings inequity were instituted on March 1st, 1876, before the U. S. Circuit Court in this City, for the ultimate purpose of having the property sold and its proceeds distributed. The Court appointed a receiver, who took possession of all the assets of the Company which were inventoried, and among which were included the parcels described in the petition.
The receiver continued in possession until after the sale, in March, 1877, which was for one million of dollars, which were paid and distributed. The deed comprising the real estate in question was approved by the court. Possession was delivered under the court’s order, and has been since then enjoyed by the Chicago, St. Louis & New Orleans Railroad Company, formed in that year.
In February, 1877, relying upon two of the judgments claimed by the plaintiff, the parties in whose name they then stood, intervened, averred the judgments, their registry, a judicial mortgage on all the real estate of the Company, the nullity of the mortgage of 1872, and concluded by a prayer to be paid by preference out of the proceeds of the real estate, then being advertised for sale. The facts do not seem to be controverted.
It is aj)parent that at the date of the registry of plaintiff’s judgments, the pieces of real estate were, as a matter of fact, in the possession and custody of a court of justice, which would undoubtedly have had jurisdiction had the property been covered by the mortgage. The act by which the mortgage was consented is in accord with the laws of Louisiana, and is also a deed of trust, or common law mortgage. This was necessary, as the mortgage was to affect property in Louisiana and other States, in which the .form to encumber real estate is different from that in which it can be done in this State. The Railroad Company, by that act, mortgaged and coveyed the road, its lands, franchises, right of way, rolling stock, real and personal property, owned and to be thereafter acquired, without any exception or reservation.
The contention in this case reduces itself to the inquiry: whether plaintiff’s claim is well founded, and whether the defendants have a *788 superior title ; in. other words, simply, whether or not the real estate described in the petition, and on which a judicial mortgage is claimed and sought to be enforced, was or not covered by the mortgage executed in 1872, the moment that it was acquired by the Company.
If it was, then the Circuit Court had jurisdiction ; if it was not, then the proceeding for the sale was a nullity as to those who were not made or who did not make themselves parties thereto.
Por the investigation of the issue presented, we propose to inquire:
1. Whether the property -was affected with the mortgage.
2. Whether the U. S. Circuit Court had jurisdiction.
I.
It was well said in Brine vs. Ins. Co., 6 Otto, 27, by the U. S. Supreme Court, that “ it is a principle too firmly settled to admit of dispute at this day, that to the law of the State, in which the land is-situated, we must look for the rules which govern its descent, alienation and transfer, and for the effect and construction of conveyances.” It may be added, that to those laws also, we are to look for the mode of encumbering real estate so as to bind not only the obligors, but also third parties.
In this State, mortgage is a real right granted to a creditor over the property of his debtor for the security of his debt, giving him the power of having it seized and sold, in default of payment. As a rule, it bears upon real estate and its accessories, and cannot be consented on future property. R. C. C. 3278, 3281, 3282, 3308.
There exists a special stipulation that the property of persons not sui juris, including corporations, cannot be mortgaged by contract, in any other form and manner than that directed by law. R. C. C. 3202.
The contract from which the mortgage results, must be evidenced in writing, and must be recorded. R. C. C. 3305, 3342,
It is not upon principle that future property cannot be mortgaged. The civil law, from its earliest days, distinctly recognized that it could be encumbered and given in pledge.
Oonventio generalispignore dando bonorum velpostea quwsitorwm recepta est. Papinian de Pign. et Hyp. Pand. pars 4,1. 20, tit. 1, Cod. L. 8, t. 18; Impp., Sever, et Ant. A. A. Lucio. Didier Pailhé, Droit Romain, 634, No. 633; Domat, vi, part 1, l. 3, t. 1.
While, by Art. 2129, the Napoléon Code declares that future property shall not be mortgaged, yet by Art. 2130, it bends the rule by expressly permitting it to be done, when the property of the debtor is insufficient and where the fact is stated and a formal consent is given to mortgage les Mens présens et á venir. Troplong, Priv. and Hyp. 2, 537; Duranton 19, 377; Merlin Rep. Hyp. sec 2, 5 3, Art. 6; DallozHyp. ch. 2, sec. 4, *789 Art. 3, Nos. 8 and 9; Favard, sec. 2, § 3, n. 10, and 10 bis.; Rolland de Villargnes, 278.
Snoli was tile law in this country, not only under the Spanish dominion, but also since-the admission of the State in the Union. Partidas 5, t.13, t.15; Curia, 381, 4.
The Code of 1808, Art. 28, p. 456, was to the effect that a conventional mortgage would extend to all the debtor’s estate, either present or to come, unless with respect to the latter some contrary disposition existed. 1 N. S. 550.
It was modified by the adoption in the Code of 1825 of Articles 3273 and 3276, which are now Articles 3306, 3308 and 3309 of the Revised Code of 1870. The new legislation provides, that to render a conventional mortgage valid, it is necessary that the act establishing it shall state precisely the nature and situation of each of the immovables on which the mortgage is granted, and that the exact sum for which it is given shall be declared in the act. The expressed consequence is, that no future property can be the subject of a conventional mortgage.
The Code of 1825 and the revised one nevertheless provide, that buildings and improvements subsequently put upon the land mortgaged shall be affected, and that if a person contracting an obligation grants a mortgage on property which he does not then own, the mortgage will be valid, if the debtor should ever after acquire the ownership of the property by whatever right, R. C. C. 3304.
The restriction of prohibition touching the mortgaging of future property, applies only to individuals in their ordinary transactions. It has no reference to judicial persons whose rights in that respect are regulated differently for the good and valid reasons that they are under the protection of administrators, who can act only advisedly and in the form and mannerprescribed by law, and who are not likely to be unduly influenced by external pressure.
Legal and judicial mortgages affect both the property owned by the debtor at the time of registry, and that which is subsequently acquired. Such mortgages are created without any stipulation, and even against the will of the debtor, in favor of incapacitated persons, .or of creditors judicially recognized. The law in its humanity has made an exception in favor of the debtor who consents a conventional mortgage, in order to place him beyond the rapacity of an exacting or merciless creditor, who otherwise would paralyze and deaden him in the blossom of life and prosperity.
"Les motifs qui ont déterminé les rédacteurs du Code á, prosorire Phypothhque générale sur les biens presents et a venir, et á n’admettre que l’hypotheque spéeiale sur les biens presents désignés par leur nature et leur situation, sont le désir: I, d’empécher le débiteur *790 ¿’engager toute sa fortune pour les besoins d’un instant; 2, d’eviter l’accumulation sur un seul immeuble, de plusieurshypotliéques dontle concours entraine toujours des frais; 3, de favoriser la spóeialité, la publioitó qui est dans l’intéret de tous.” Rep. J. P. Vol. 8, p. 367, No. 134 ; Laurent, XXX, No. 514.
But, whatever those flexible rules be, they are such as have been prescribed by the law making power, which, in the absence of constitutional inhibition, has the right to modify them, and give them sneh further elasticity as, in its wisdom, it may see fit and proper.
Laws have consequently been passed for the special benefit of railroad corporations, on this subject of mortgages, and are to be found either in their respective charters, or in general statutes referring to them.
The title of the defendants originates in the deed by which the railroad corporation mortgaged its lands, property, franchises, rights of way, rolling stock, real and personal property, owned or to be thereafter acquired, without any exception or reservation, to secure the payment of the bonds already mentioned, and the interest thereon, which were designed to obtain the money necessary to accomplish the purpose* heretofore stated.
The authority to borrow money and make such a mortgage for the continuation and maintenance of the road in this State, is conferred in the charter granted and in statutes which apply to railroad corporations. These statutes have the physiognomy of those which have been adopted in pari materia, in other States of the Union, and which form part of the law of railroad corporations. The operation and extent of those statutes have been uniformly judicially determined.
It is notorious that, in the United States, railroads have been constructed for the most part with money borrowed upon the issue of negotiable bonds, secured by mortgage, which are intended for circulation in distant cities in this country and abroad. It is patent that there should exist, and that there is, a uniformity in the conditions of the mortgage, -which is purposed to induce and assure capitalists who are asked to lend money for long periods of time. The railroad, with all its accessories and appurtenances, is generally disposed of in ¡¡lobo, for it forms an entirety, an organism which should not be dismembered or parcelled out. The character of the business and time require* changes in the condition of the property, which necessitate additions, ameliorations and removals. Hence, mortgages, in order to afford a real guarantee, have to be made so as to include all of these, actual and prospective.
By its charter, granted in 1853, the New Orleans, Jackson & Great Northern Railroad Company was authorized to secure their loans by *791 mortgaging the property of the Company, in whole or in part, as they shall deem expedient.
In 1854, 1855 and 1856, the General Assembly passed acts regulating the power of railroad corporations, conferring that of securing the payment of any obligations contracted by them for the construction of the road and for repairs upon it, by mortgage, whether the road had been completed or not at the time of making the mortgage, and that such mortgage would bind the property, the franchises and appurtenances of said railroad, its warehouses, depots, water stations, locomotives, and the like, registry being required at the place of domicil only. Acts 1853, No. 148, p. 114; 1854, No. 145, p. 112; 1855, No. 341, p. 485; 1856, No. 194, p. 205; Rev. Stat. 692, 726, 727.
The general legislation of those years, intended to constitute a unit, did amplify the charter of the Company. It conferred upon the New Orleans, Jackson & Great Northern Railroad Company, and upon all similar companies then, or thereafter in existence, identical powers, should they deem proper to exercise them. Those innovations to our local system, relative to conventional mortgages and to the power granted by the charter of 1853 to the Jackson Road, were prompted by and derived from other systems of legislation, necessitated by the urgent wants of like organizations in other States. The meaning, object and purport of that legislation can and must, therefore, be ascertained by an inquiry into the jurisprudence of the other States in which such statutes were adopted on the subject.
A review of the jurisprudence shows that there has been an uniformity in the decisions of the courts in that regard.
In the case of Pennock, 23 How. 175, from Ohio, the Supreme Court of the United States said:
“ Although the maxim is true, that a person cannot grant what he has not got, yet, in this case, a grant can take effect upon the property when it is brought into existence and belongs to the grantor, in fulfilment of an express agreement, founded on a good and valid consideration, where no rule of law is infringed, or rights of a third party prejudiced.” Vide also, 4 Otto, 382; 1 Wall. 254; 11 Wall. 459; 5 Otto, 10; 23 How. 128; 25 Barb. 284.
The ease of Dunham vs. Railway Company, reported in 1 Wall. 254, is a decisive authority. The statute under consideration was substantially that which appears in the itnenlarged charter of the Company in the instant case. It empowered the corporation to borrow money for completing and operating their railroad, to mortgage their corporate property and franchises. The mortgage, however, included the railroad built and to be built, and the right of way. The Court decided that it was clear law, that the trustee, for the benefit of the *792 ■bondholders, took “ the road built and to be built,” together with all the other matters and things enumerated in the mortgage. Express authority was given to the Company by the law of the State, to borrow such sums of money as they deemed necessary for completing and operating their railroad and to issue and dispose of their bonds for any amount so borrowed. What they wanted was money, so as to make their road, and the authority was in as many words conferred to mortgage it for the purpose. The Court cited the early case, decided four years previous, reported in 23 How. 128, where the rights of the parties depended upon the general rules of law. This ruling is fully confirmed in subsequent adjudications by the same tribunal. 5 Otto, 10 ; 11 Wall. 459. Vide also, 2 Story Eq. J., 644.
There are other decisions to the same effect, on analagous statutes, by State courts. 100 N. S. 372; 18 Monroe, 431; 45 Barb. 284; 34 Vt. B. 484; 10 Gray, 568; 32 N. H. 484 ; 24 Wis. 551; 14 Minn. 297 ; 64 Penn. St. 366. These adjudications are substantially to the effect, that when the power is given to a railroad company to contract for loans and to mortgage its property to secure the payment of the debt, it conferred that of mortgaging the franchise, to maintain the railway and to take tolls, and all its property, present and prospective.
The high authority of those cases is such, that it cannot yield to whatever may have been determined in opposition, if so, by the U. S. Circuit Court for the Western District of Tenessee, in 1879, in the case of Calhoun, and by the U. S. Circuit Court for Maryland, in a suit involving the sale of real estate directed by a will, -which was annulled, because the land sold had been mentioned neither in the petition, nor in the decree.
Under its charter and the statutes mentioned, the Jackson Bailroad Company could mortgage its road, completed or not, and all the paraphernalia thereof. A road can be considered as completed only when all the land required for its purposes, from its inception to its terminus, for all its branches, for all its stations, depots, warehouses, when all its locomotives, cars and vehicles have been purchased or acquired, when all the buildings necessary for its manifold purposes have been put up and furnished, and the entire organism is in full operation and continues in good order. It is seldom that a road can be said to be completed, when it has the means of improving and uses the same, for it continually adds to its purchases of lands, for the purpose of building thereon now stations, depots or shops. When completed, as a matter of course, its buildings, its rolling stock and other paraphernalia, will necessitate repair, replacing, renewal. Hence it is, that it was designed to give to the conventional mortgage, in such cases, as to future property of any description in the intendment of the parties *793 and within the purview of the contract acquired to maintain and complete the road, the same effect which the law accords to legal and to judicial mortgages, which affect and encumber property the very moment that it is acquired and forms part of the bulk of the estate of the debtor.
The mortgage of a railroad, its lands, property, franchises, rights and appurtenances, with the buildings, structures and improvements, comprehends not only the property in esse, forming part of the organism or structural arrangements, or the machinery and apparatus for the construction, maintenance or operations of the railroad, whether movable or immovable, but also such as shall be obtained, or added during the existence of the debt. The inquiry in such a case is not so much whether a person can grant, in, presentí, a security on property not yet belonging to him, but whether, where the law authorizes the mortgage of a road, completed and to be completed, the mortgage will affect the property, when it becomes the grantors, in fulfilment of an express agreement, founded on a good, real and valuable consideration.
The real estate described in the petition, acquired since the date of the mortgage, became affected with it hs effectually as though it had been expressly described in it, and the inscription of the judgments which plaintiff represents, as assignee, would have created a judicial mortgage, securing their payment, but for the proceedings in equity, which conduced to a sale, which can be well compared to the sale which would have been made of them, under executory process, had the circumstances justified a fiat in a State court.
The registry of the judgments, after the property subject to the mortgage had been taken possession of by the United States Circuit Court, could produce no more effect than if the same property had been seized by a sheriff, under a writ of seizure and sale. It is true, that a judicial mortgage is created by the mere registry of a' judgment, but it does not follow that, on that account, property has been effectually reached and encumbered. When such registry takes place, and the property previously encumbered sells for more than is necessary to pay and discharge anterior encumbrances, the purchaser has a right, under our law, to retain the remainder of the price of adjudication, subject to the rights against it of the registered judgment creditors, or eventually of the owner himself; but -when the property does not net enough to satisfy superior mortgages, the judgment creditor, whatever his judicial mortgage may be, if the sale transferred the property, can have recourse neither against the purchaser, nor against the property, which, under the seizure and the sale, passed to him, by the adjudication of the law officer.
*794 ii.
The jurisdiction of the United States Circuit Court in equity, and the binding- effect of the exercise of the same, cannot be doubted.
In 9 Peters, 632, the United States Supreme Court said :
“ From the moment of the establishment of the District Court in the District of Louisiana, there was vested in it, by the Constitution, equity powers and jurisdiction. Those powers and that jurisdiction cannot be changed or limited by any act of Congress. It is not to be disputed, after admitting the equity jurisdiction of the Court, that its chancery powers are the same as those of other Circuit Courts of the United States. Its remedies are not to be according to the practice of the State Court, but according- to the principles of equity, as distinguished and defined in that country from which we derive a knowledge of our principles.” See also, 4 Wh. 108; 2 Story R. 555; 3 W. 212-220; 20 How. 558; 21 How. 582.
It was also said by the same Court:
“When a court has jurisdiction, it has a right to decide every question which occurs in the case. When the jurisdiction and the right of plaintiff to prosecute 1ns suit have once attached, the right cannot be arrested or taken away by proceedings in another suit. These rules have their foundation, not merely in equity, but in necessity. For, if one may enjoin, the other may retort, and thus the parties be without remedy. 7 How. S. C. R. 612.” This is true even when the jurisdiction is concurrent. 9 Wh. 532; 20 How. 583.
It is also held, that he who meddles with property in litigation, does so at his peril and is as conclusively bound by the result of the litigation, whatever it may be, as if he had been a party to the suit. They take the title subject to the contingencies, take the chances and must abide the result. 93 U. S. S. C. R. 163; 1 DeGex & Jones, 606; 4 Drury & W. Rep. 58-80; 5 Mon. 73; 35 Conn. R. 250; 20 How. 94; Fisher on Mortgage, 222.
Such is also the law and jurisprudence of this State on that subject, though in 24 A. 551, by a divided Court, it was held that the creditor would have to resort to the hypothecary action, as the plaintiff has done in this case. The legislation since made (1878, Act 3) has settled the jurisprudence on that subject. See 19 A. 356; 3 A. 248; 13 L. 260; 12 A. 873 ; 29 A. 465, 488.
In 14 Wall, 66, the United States Supreme Court says: The settled rule is, that where the subject matter of the suit in equity is real estate, which is taken into the possession of the Court, pending the litigation, by the appointment of a receiver, the jurisdiction attaches.
*795 It is to be observed, that the railroad corporation, by its negotiation of more than three millions of dollars of its bonds, has received the consideration for the mortgage. When, therefore, it subsequently acquires property answering the description of property to be acquired, and such as was within honest intendment, it was bound, in equity, to transfer the interest to the mortgagee, or purchaser, immediately on the property being acquired. The object of the suit, in March, 1876, before the United States Circuit Court, and of the sequestration, was to compel the fulfilment of the terms and obligations of the contract. The decree was in furtherance of, and accomplished the object of the contract. No person could have been deluded or deceived, for the mortgage act, which is full and explicit, had been put on public record previous to the consolidation of the two companies, and before any credit had been given to the. consolidated company by any one. 2 Lowell, 458; 4 Met. 306; 64 Penn. 366 ; 23 How. 128.
Upon the whqle, we consider that, under the laws of the State, the New Orleans, Jackson & Great Northern Railroad Company had authority, in order to secure the payment of the bonds which it issued, for purposes of construction, repairs and improvement of the road, to mortgage its road completed and to be completed; that the effect of such mortgage is assimilated to that of a legal or judicial mortgage, which is prospective .from the time of registry; that the two parcels of real estate described in the petition, and which are indispensable accessories and adjuncts, became affected with such mortgage from the time of their acquisition by said Company ; that the United States Circuit Court had jurisdiction in equity to enforce the mortgage so contracted ; that the said two parcels of ground were embraced within and covered by the mortgage ; that the same went into the possession and control of said Court from the moment that it appointed a receiver, who qualified and took the same in his custody and care, with the other assets of the defaulting Company; that the proceeding in' that Court, likened to one in rem, was binding upon all who had an interest at stake ; that the sale of said property, ordered and executed, was legal, and transferred the title, which passed to the defendant in this case; that the registry of the judgment, whereof the plaintiff is the assignee, did not affect the property which was then in Qiistodia legis j that the irarcliase price having been paid into, and distributed by said Court, all claiming a privilege or a mortgage against the property thus judicially sold, should have intervened and claimed participation; that the price having proved inadequate, by far, to discharge the mortgage debt of 1872, the judgment creditors, even if their judgments had been registered previous to the proceedings to enforce *796 the mortgage, would have no claim, either against the property, or against the purchasers; that still less have they any such, the registry having been made after the Court had taken possession of the property; that said property is, therefore, not liable as claimed, and that plaintiff’s demand was properly denied.
It is, therefore, ordered and decreed, that the judgment appealed from be affirmed, with costs.
Levy, J., absent.