E. L. PHEISTER, Appellant
(Plaintiff below),

v.

OGDEN SMELTING & REFINING MILLS, INC., Leo T. Aimonette, d/b/a Big Basin Drilling Company, Union State Bank of Upton, Wyoming, Appellees (Defendants below).

No. 3018.

Supreme Court of Wyoming.

Sept. 26, 1961.

Halsey, Whitley, Hollaway & Liamos, Newcastle, for appellant.

Ilsley & Lubnau, Gillette, for appellee Union State Bank of Upton.

No appearance for appellees, Ogden Smelting & Refining Mills, Inc., and Leo T. Aimonetto.

Before BLUME, C. J., and PARKER, HARNSBERGER and McINTYRE, JJ.

Mr. Chief Justice BLUME delivered the opinion of the court.

This case involves the question of priority between a mortgage lien and a lien for labor and material furnished for an oil and gas lease.

We shall state the facts as near as we can in chronological order. The mortgage referred to herein was executed on January 10, 1958. By that mortgage Leo T. Aimonetto and his wife mortgaged to the Union State Bank of Upton, Wyoming, hereafter mentioned as the bank, the so-called Bedell-Sedgwick lease covering the SE¼NE¼, E½SE¼, Sec. 14, and the E½NE¼, NE¼SE¼, Sec. 23, all in T. 44 N., R. 62 W., 6th P.M., together with all licenses, easements, rights and privileges, and all incomes, rents, royalties, profits and proceeds from the mortgaged property, and all oil, gas and casinghead gas produced from the mortgaged property, in consideration of the sum of $25,000 loaned by the bank to the

mortgagor. Paragraph 2 of the mortgage provides:

"That Mortgagor will not sell, mortgage, assign or otherwise dispose of said mortgaged property or any part thereof (except as may be permitted for the sale of the current production of oil, gas and casinghead gas under the terms of Paragraph Six hereof) * * *."

Paragraph 3 provides:

"* * * that Mortgagor will operate and develop said leases prudently and economically and in accordance with the best approved practices in the field or vicinity in which said leasehold estates are located * * *."

Paragraph 6 provides as follows:

"That it is the intent and purpose of the parties hereto to convey, transfer and mortgage to the Mortgagee all oil, gas and casinghead gas produced from the mortgaged properties above described as constituting a part of the corpus of said mortgaged properties, and the Mortgagor has, or will, on demand of the Mortgagee and from time to time and as often as requested by Mortgagee, execute and deliver to the Mortgagee any and all necessary transfer orders, division orders, assignments or other written instruments that Mortgagee may request or the pipeline companies or purchaser of oil, gas and/or casinghead gas may require evidencing vesting the Mortgagee the full title to the oil, gas and casinghead gas produced from the mortgaged property and the proceeds from the sale thereof, and the Mortgagee may from time to time sell oil, gas and/or casinghead gas produced from the mortgaged properties at the then market price, and in such quantities as the Mortgagee may from time to time elect, and all moneys received, less reasonable expenses which may be incurred in connection with such sales, shall be received and applied periodically on any indebtedness or obligation due or owing from the Mortgagor to Mortgagee, said application to be made at such times as may be agreed upon, or (in the absence of such agreement between the parties hereto) upon a date of each month fixed at the election of the Mortgagee, provided, however, that until notified in writing by the Mortgagor or Mortgagee to the contrary every purchaser of oil, gas or casinghead gas in the usual course of business and on appropriate order of the Mortgagor may pay the Mortgagor the purchase price of such oil, gas and casinghead gas that may be currently produced. Mortgagee, at its option, may release to or pay over to Mortgagor all or any part of any amounts so received, and no such action on its part shall operate as a waiver or release of this mortgage or the lien thereof or prevent it from applying to the payment of the indebtedness hereby secured all or such portion of any further proceeds received by it that it may elect. Mortgagee shall be under no obligation to collect any sums and under no responsibility to see that purchasers are properly accounting for oil and gas so run from said mortgaged premises and shall only be liable for what it actually receives."

On the 10th day of March, 1959, Leo Aimonetto, as party of the first part, and Ogden Smelting & Refining Mills, Inc., as the second party, entered into an agreement whereby the first party agreed to sell and the second party agreed to buy:

"3. All of the interest of Leo Aimonetto, d. b. a. Big Basin Drilling Co., in the Bedell-Sedgwick lease covering SE¼NE¼, E½SE¼ Section 14; E½NE¼, NE¼SE¼ Section 23, Township 44 North, Range 62, including the wells located as follows:"

Paragraph 3 of the contract provides:

"As part of the purchase price of the wells, when the same has been determined, Second Party assumes and

agrees to pay off the present mortgage to Union State Bank at Upton, Wyoming, being the amount of $25,000.00, plus interest. Said Union State Bank having agreed to accept payment as follows: $5000.00, plus interest, on or before April 1, 1959; $5000.00, plus interest, on the first of each month thereafter, and the balance due 120 days after the date of this contract."

The other facts in the contract need not be set forth. On April 9, 1959, a modification of the contract was entered into between the parties in which a more specific right of Leo Aimonetto was specified and in which it was provided that the Union State Bank of Upton, Wyoming, should act as escrow agent in holding the agreement between the parties.

Thereafter, as found by the court, the Ogden Smelting & Refining Mills, Inc., entered into an agreement with E. L. Pheister, the plaintiff and appellant in this case, to furnish labor and material in connection with the leasehold interest above mentioned so as to make the wells on the premises really producing wells and for the improvement of the leasehold in general. The plaintiff and appellant accordingly entered upon the premises and furnished labor and material to improve the lease. He thereupon gave notice of a lien dated August 13, 1959, and recorded September 19, 1959, directed to the Ogden Smelting & Refining Mills, Inc., Leo T. Aimonetto, Union State Bank, and the Carter Oil Company. The lien was claimed on wells Nos. 2, 5 and 6 and upon all other wells and upon the material situated on the premises. The notice of claim of lien also stated:

"That all of the said services rendered, labor, equipment, supplies and materials furnished were for the benefit of said lease and lands and for the purpose of developing and operating thereon for oil and gas and for the production of the same. That there is now due and owing from the above named persons and corporations to the under-

signed lien claimant the amount of $6,-967.09 * * *."

An itemized statement of labor and materials furnished was attached.

It seems that in the meantime the oil and gas produced on the premises was sold to Wyoming Crude Purchasers, Inc., Newcastle, Wyoming. On September 30, 1959, the plaintiff gave notice to that purchaser that he had a lien on the premises for $6,-967.09 and that the purchaser would be liable to the claimant for any oil proceeds derived from oil produced from the working interest on the above described lease and lands.

It may be mentioned in this connection that from January 5, 1958, to January 5, 1959, only 77.02 barrels of oil were derived from the premises, but during the period of January 5, 1959, to December 1959 the lease produced 2,039–2,398 barrels of oil, showing the benefit of the work done by the plaintiff. The oil produced from May 1959 through May 1960 amounted to 3,176 barrels, netting the sum of $8,164.08, which was still in the hands of the purchaser of the oil who refused to turn over any proceeds to anyone until the title to the oil was fully established. On October 25, 1959, plaintiff brought the action herein to foreclose the lien hereinbefore mentioned, making the Ogden Smelting & Refining Mills, Inc., Leo T. Aimonetto and the Union State Bank of Upton, Wyoming, parties defendant. The petition asked for the foreclosure of the lien heretofore mentioned. The bank filed an answer claiming that its mortgage lien was prior and superior to the lien claimed by plaintiff. The case came on for trial before the District Court of Weston County, Wyoming, the Honorable Rodney M. Guthrie presiding, on June 20, 1960. The court found generally in favor of the defendant, Leo T. Aimonetto, and against plaintiff in that the former had no interest or estate in the oil and gas lease described in plaintiff's complaint. The court found generally for the bank and against the plaintiff, the court stating:

" * * * That the defendant bank has a mortgage dated January 10, 1958, which was filed in Mortgage Book 56 at page 336 in the office of the County Clerk, Weston County, Wyoming, which mortgage is a first lien upon all the interest of defendant mortgagor Leo T. Aimonetto and his successors in and to the oil and gas lease herein described and upon all the interest of the defendant mortgagor Leo T. Aimonetto or his successors in and to the oil and gas produced from said lease and upon the proceeds from the sale of such oil and gas."

The court further found that plaintiff had a valid lien, subject only to the mortgage of the bank as above mentioned and judgment for foreclosure was accordingly entered, however without adjudicating the proportioned ownership of the oil produced and the proceeds thereof. From the judgment so ordered, plaintiff has appealed to this court.

The plaintiff herein claims his lien on the leasehold property as well as on the oil produced and the proceeds thereof pursuant to §§ 29–29 and 29–31, W.S.1957. Section 29–29 provides in part as follows:

"Every person * * * who does work or labor upon, or furnishes or rents material or services for constructing, altering, digging, drilling, boring, operating, completing or repairing of any gas wells, oil wells or other wells * * * by virtue of a contract, express or implied, with the owner, part-owner or lessee of any interest in real estate, or the authorized agent of any such owner, part-owner or lessee * * * shall have a lien to secure the payment thereof * * * upon said gas well, oil well, or other well and upon said oil derricks, oil tanks, oil or gas pipeline including the right-of-way therefor * * * and upon all material furnished to be used in connection with said improvement, and upon the whole of the land or leasehold including all other wells, buildings and appurtenances located upon said land * * *."

The statute, however, provides that the lien shall not extend to the underlying fee or royalty interest unless expressly provided by contract with the owner of the underlying fee or royalty interest. Section 29–31 provides:

"The lien provided for in this act [§§ 29–27 to 29–32, 29–34, 29–39] shall additionally extend to and cover all oil or gas produced attributable to the interest which is subject to the lien and the proceeds thereof inuring to the working interest therein as such working interest existed on the date labor was first performed or materials or services were first furnished. * * * "

The section further provides that the lien shall not be effective as against a purchaser of the oil and gas until written notice of the lien is given to such purchaser but that after such notice the purchaser would be required to hold the proceeds subject to the rights of the lien claimant.

The appellant herein contends that the mortgage to the bank should be considered as a mortgage on real estate together with the rents, issues and profits thereof, and that in such a case the mortgage as to the rents and profits does not become effective as against an intervening lien until the mortgagee forecloses the mortgage or takes active steps to secure possession of these rents and profits. The rule in that regard dates back to the time of Lord Mansfield, as shown in the case of Chinnery v. Blackman, 3 Doug.K.B. 391, 99 Eng.Rep. 712, in which the rule was laid down substantially as contended by the appellant herein. Judge Augustus N. Hand approved the rule in the case of Prudential Ins. Co. of America v. Liberdar Holding Corporation, 2 Cir., 74 F.2d 50, 51. He based the rule upon public policy, stating, among other things, as follows:

"It seems unlikely that mere words of assignment of future rents can entitle a mortgagee to claim rentals which have been collected by a mortgagor and mingled with its other property. Sound policy as well as every probable

intention should prevent a mortgagee from interfering with the mortgagor's possession until the mortgagee takes steps to get the rentals within his control. To hold otherwise would be to impose unworkable restrictions upon industry in cases where mortgagors have been led to suppose that they might rightfully apply the rentals to their own business. The failure of the mortgagee here to claim rents prior to the time when it filed its petitions on December 15, 1933, and its practical acquiescence in their retention by the mortgagor and its receivers prevent the mortgagee from acquiring any rights in them."

In the case of American Bridge Company v. Heidelbach, 94 U.S. 798, 800, 24 L.Ed. 144, the bridge company gave a mortgage which included the rents, issues and profits of the bridge. The appellant in that case acquired a lien against the profits of the bridge company before the mortgagee took active steps to enforce its lien against the rents, issues and profits. In that case the court, in holding the lien to have a prior right, said:

"In this case, upon the default which occurred, the mortgagees had the option to take personal possession of the mortgaged premises, or to file a bill, have a receiver appointed, and possession delivered to him. In either case, the income would thereafter have been theirs. Until one or the other was done, the mortgagor, as Lord Mansfield said in Chinnery v. Black, 3 Doug. 391, was 'owner to all the world, and entitled to all the profit made.'"

In the case of Johnston & Stewart v. Riddle, 70 Ala. 219, 226, an express company mortgaged its property together with all tolls, incomes, issues and profits. A lien against some of the income was secured by garnishment and the question was whether or not this lien was superior to the mortgage. It was held that it was. After stating the general rule above mentioned, the court further stated:

"It is insisted, however, that this rule it not applicable to the present case, because the mortgagor here conveyed all the property, real and personal, of the railroad company, 'together with all the tolls, incomes, issues and profits, which may accrue from the road' in its use or operation, and that the money here attached by process of garnishment in the hands of the express company is in this manner specifically pledged. But the answer to this view is manifest. It is clearly contemplated that the mortgagor should continue to hold possession of the mortgaged property, and should be permitted to operate and use it, and receive and appropriate its earnings, until such earnings should be claimed by the trustees in the mortgage. Until a claim was interposed, therefore, by the mortgagees or trustees, the earnings belonged to the railroad company, who was in this case the mortgagor and defendant in the judgments upon which the several garnishments in question were sued out. This view of the question is fully sustained by the adjudged cases.—1 Jones Mortg. § 670; Fosdick v. Schall, 99 U.S. 235 [25 L.Ed. 339]; [American] Bridge Co. v. Heidelbach, 94 U.S. 798 [24 L.Ed. 144]; Gilman v. [Illinois & Mississippi] Telegraph Co., 91 U.S. 603 [23 L.Ed. 405]; Galveston R. R. v. Cowdrey, 11 Wall. 459 [20 L.Ed. 199]; Noyes v. Rich, 52 Me. 115."

The rule is stated in 36 Am.Jur. Mortgages § 293, as follows:

"The general rule is that in the absence of a prohibitory statute a mortgagor may pledge the rents and profits of real estate in a mortgage thereof. However, the circumstance that the rents or profits are specifically pledged in the mortgage as security gives the mortgagee no right to them before the taking of possession by him, or before the taking of some action on his part to reduce the rents and profits to possession; in such case the rents and profits belong to the mortgagor * * *.

* * * Moreover, in the absence of some action on the part of the mortgagee to reduce the rents and profits to his possession, a prior right thereto may be acquired by a third person, such as a junior mortgagee who first takes action to secure to himself the rents and profits, or a creditor who obtains a lien thereon by judicial process. * * *"

The cases stating this general rule are very numerous. Annotations on the subject are contained in 4 A.L.R. 1405, 1413; 55 A.L.R. 1020, 1022; 87 A.L.R. 625, 628; and 91 A.L.R. 1217, 1221. See also 59 C.J.S. Mortgages § 317, pp. 424, 425. In 3 Summers, Oil and Gas, Perm. Ed., p. 699, the author states as follows:

"Leasehold interests are chattels real, interests in real estate, and mortgages of such should be treated as mortgages of real estate. Quite generally, mortgages of oil and gas leases have been so treated. * * *"

On pp. 705, 706, of the same volume he states:

" * * * In accord with the general rule as to rents and profits, the mortgagor in possession takes the oil free of the mortgage lien. * * * Since the purpose of the mortgagor in giving the mortgage is usually to enable him to operate and develop the lease, it would seem that he should have power to so operate and to market the products unless the security is thereby impaired. In the latter event, a receiver should be appointed. * * *"

In the case of Riverview State Bank v. Ernest, 10 Cir., 198 F.2d 876, 34 A.L.R.2d 892, certiorari denied Ernest v. Riverview State Bank, 344 U.S. 892, 73 S.Ct. 212, 97 L.Ed. 690, the rule heretofore mentioned was applied, citing some Kansas cases. However, in that case the mortgagee had taken active steps to take possession of the income from the oil and it was held that under the provisions of the mortgage and the division and transfer orders, the bank was in effect a mortgagee in constructive possession of the oil and, in view of that

fact, the mortgage was considered prior to a lien in favor of someone else.

It would seem as though oil that comes out of the ground may well be considered as coming within the definition of "issues" and may well be considered as profits in view of the fact that if such oil is not procured by digging wells and making the wells productive, the owner or mortgagee would have no benefit from the oil that is still in the ground.

In the case at bar, the bank, the mortgagee, made no effort of any kind whatever to take possession or control of the oil produced on the leasehold in question or the proceeds thereof up to the time when appellant's lien became effective. The lien of the appellant must accordingly be held to be prior and superior to the claim of the bank insofar as the oil and the proceeds thereof are concerned. The date of priority, however, must be held to relate back only to the time when the work and labor of the appellant was completed, which according to his statement was on June 15, 1959. See 57 C.J.S. Mechanics' Liens § 177. The judgment of the district court must, accordingly, be reversed insofar as it held that the bank's lien was superior to that of appellant as to the time and extent above mentioned.

Section 29–33, W.S.1957, provides for the priority of liens. That statute provides that a prior mortgage shall not be affected by a lien insofar as the land or leasehold is concerned at the time of the inception of the lien, and it is apparently contended by appellant that the right to a prior lien on the land or leasehold was waived by reason of the fact that the bank held in escrow the contract between Aimonetto and the Ogden Smelting & Refining Mills, Inc., and that it accepted some money on the mortgage at that time. We cannot concur in that contention and must hold that the lien of the appellant together with its priority extends to the oil and the proceeds thereof as distinguished from the land or leasehold. The lien of appellant seems to be subject to the underlying royalty

interests of 12½ percent and the royalty interest of the Carter Oil Company in view of the fact that these interests are not affected under the provisions of § 29–29, W.S. 1957, it not appearing that the parties owning the underlying royalties made any contract with the appellant as mentioned in the foregoing section. The matter is for the trial court to determine.

The case is remanded to the district court with direction to enter judgment in favor of appellant to the extent above mentioned and to take such further steps as may be necessary or proper to finally adjudicate all the rights in the oil here in question and the proceeds thereof.

Reversed with directions.